# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE

FILED

September 7, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

FOR PUBLICATION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **Filed: September 7, 1999** |
| | ) | |
| Appellee, | ) | MAURY COUNTY |
| | ) | (Transferred from Giles County) |
| | ) | (Trial Court Nos. 7040 and 7041) |
| v. | ) | |
| | ) | Hon. Jim T. Hamilton, |
| PAT BONDURANT, | ) | Judge |
| | ) | |
| Appellant. | ) | Supreme Court |
| | ) | No. 01-S01-9804-CC-00064 |

FOR APPELLANT:

William P. Redick, Jr.
Whites Creek, Tennessee
(After Trial & On Appeal)

Peter D. Heil
Nashville, Tennessee
(After Trial & On Appeal)

Jerry C. Colley
John Colley
Colley & Colley
Columbia, Tennessee
(Trial Only)

FOR APPELLEE:

Michael Moore
Solicitor General

Amy L. Tarkington
Nashville, Tennessee

T. Michael Bottoms
District Attorney General
22nd Judicial District

James C. Sanders
Assistant District Attorney General

James G. White, II
Assistant District Attorney General
Columbia, Tennessee

# O P I N I O N

REVERSED AND REMANDED
FOR A NEW TRIAL.                                                    DROWOTA, J.

In this appeal, the defendant, Pat Bondurant, was convicted of premeditated

first degree murder and arson. Upon finding that the State had proven two statutory

aggravating circumstances[1] beyond a reasonable doubt and that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances, the jury sentenced the defendant to death by electrocution on the conviction for first degree murder. On the arson conviction, the trial court sentenced the defendant to ten years consecutive to the death penalty. The Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, the case was docketed in this Court[2] and set for oral argument with respect to eight of the issues raised by the defendant. See Tenn. S. Ct. R. 12.

After carefully considering the briefs and arguments of counsel, relevant legal authority, and the entire record on appeal, we conclude that the defendant's convictions of first degree murder and arson must be reversed and the case remanded for a new trial. The defendant offered clear proof to establish that the statutory procedures governing selection of a special jury venire were totally disregarded and that the jury, which was required by law to remain sequestered, was allowed to separate twice daily to drive between their lodgings and the courthouse. No evidence was offered by the prosecution to refute the defendant's claim regarding the selection of the special venire or to rebut the defendant's prima facie showing of jury separation. Under clear and longstanding Tennessee precedent a new trial is required if the State does not offer proof to negate prejudice once the fact of jury separation has been established by the defense.

Furthermore, in a highly publicized capital murder case it is particularly important that trial courts scrupulously enforce the statutory directives governing

---

[1]The jury found the following two aggravating circumstances: (1) "[t]he defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;" and (2) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(2) and (5) (1982). These statutory aggravating circumstances were redefined in 1989 and are currently codified at Tenn. Code Ann. § 39-13-204(i)(2) and (5) (1998 Supp.).

[2]Tenn. Code Ann. § 39-13-206(a)(1) (1997 Repl.).

selection of a special venire and the law requiring jury sequestration. Otherwise, the risk is great that a jury will base its decision on extraneous information. Here, the trial court failed to utilize the selection procedures prescribed by the statute and also allowed the jury to separate twice daily during the course of the trial. In the absence of countervailing proof from the State to show that the jury's decision was not influenced by extraneous information, we are unable to conclude that these serious errors were harmless. Accordingly, the defendant's convictions are reversed and the case is remanded for a new trial.

As a result of the remand, many of the errors assigned by the defendant in this appeal have been rendered moot and are pretermitted. However, because this issue will be relevant upon remand, we have also considered the defendant's claim that the indictment should be quashed because of racial discrimination in the selection of the grand jury foreperson and now conclude that the claim is without merit.

# I.

## FACTUAL BACKGROUND

While the dispositive issues in this appeal relate to the selection of a special venire and the sequestration of the jury, the following brief summary of the State's trial proof is offered to place the issues in context.[3]

The defendant, Pat Bondurant, and the victim, William Ronnie "Hippy" Gaines, were friends and co-workers at the Pulaski Rubber Company in Giles County. Gaines left work on Friday, October 17, 1986, and has never been seen alive since. Five days later, on Wednesday, October 22, 1986, Gaines' house was damaged by

---

[3]Though we have not included a detailed recitation of the facts, we have carefully reviewed the record and agree with the Court of Criminal Appeals that the defendant's challenge to the legal sufficiency of the convicting evidence is without merit.

a fire that arson investigators determined had been set in the front left bedroom. A missing person investigation to locate Gaines began on the evening after the fire but was unsuccessful.

More than three years later, in May of 1990, law enforcement officers interviewed Denise Bondurant, the defendant's estranged wife. According to Denise Bondurant, who testified at trial, the defendant had confessed to her both the killing of Gaines and the burning of the victim's house.[4] Denise testified that the defendant had been angry at Gaines for some time because the defendant suspected that Gaines had stolen his wallet containing money from the monthly social security disability check belonging to the Bondurants' disabled son, Matthew.[5] During this time, the defendant had made veiled threats against anyone who stole "from him or little Matthew." The defendant told Denise that on the evening of October 17, while at Gaines' house, he caught Gaines cheating while playing cards. At this point, the defendant "just went off," and beat Gaines to death with a small rocking chair because he "could not allow anyone to take anything from little Matthew." The beating, which continued for thirty minutes after Gaines had died, was of such force as to leave only a small piece of the rocking chair intact. The defendant and his brother, Pete Bondurant, dismembered the victim's body, cleaned the house so that no trace of blood or hair remained, and transported the body to their parents' home in Westpoint, Tennessee, where they burned the corpse.[6]

---

[4]According to Denise, on the day after Gaines' house burned, the defendant's brother confessed to her that he had set fire to Gaines' house by placing a lighted candle in the middle of the bed in the left front bedroom.

[5]At trial, Wade Bass, another of defendant's acquaintances, testified that he had taken the wallet after he found it lying on the floor of a tavern where the defendant and Gaines had been drinking. The wallet contained $300 in cash and checks.

[6]The proof showed that the defendant's parents were out of the country at the time this burning allegedly occurred.

In May of 1990, relying upon information provided by Denise Bondurant, law enforcement officials obtained a search warrant and returned to the Westpoint house where, with the help of a team of forensic anthropologists, they located seven burned human cranial fragments.[7] Dr. William Bass, the leader of the forensic anthropologists, testified that he was 100 percent certain that the bones were human, 75 percent certain that they came from a male, over 50 percent certain that blunt trauma had been applied to the skull before it had been burned, and 90 percent certain that the bones had been in the ground no less than one nor more than fifteen to twenty years.

Other proof also supported Denise's testimony and the forensic evidence. For example, a child's rocking chair that had been in the front left bedroom of Gaines' house was missing after the fire. The defendant had also made several strange or incriminating statements around the time of Gaines' disappearance. These statements ranged from the defendant's remark that Gaines had joined the Foreign Legion to the defendant's outright admission to one co-worker that he had "killed the son-of-a-bitch."

Based on this evidence, the jury found the defendant guilty of first-degree premeditated murder and arson.

At the sentencing hearing, the State introduced proof of the defendant's conviction of second degree murder in Giles County in March of 1991. The defense presented the testimony of the defendant's mother, who recounted the circumstances of the defendant's childhood and described him as an exemplary son, who had

---

[7]The defendant asserts that both the trial court and the Court of Criminal Appeals erred in concluding that he lacked standing to object to the search of his parents' home and property. The evidence does not preponderate against the lower courts' findings. Accordingly, we conclude that the defendant's claim that the evidence should be suppressed is without merit. This evidence was properly admitted.

helped his parents, maintained a close and loving relationship with his family, and worked steadily for seventeen years. Relying on this proof, the jury found that there were no mitigating circumstances sufficiently substantial to outweigh the two aggravating circumstances proven by the State and imposed a sentence of death by electrocution. On the arson conviction, the trial court sentenced the defendant to ten years consecutive to the death penalty.

The defendant filed a motion for new trial. Thereafter, William Redick and Peter Heil were substituted for trial counsel, Jerry and John Colley, who had been allowed to withdraw. An amended motion for new trial was filed on behalf of the defendant by Redick and Heil in which several additional claims were raised, including ineffective assistance of trial counsel.[8] A full hearing was conducted on the motion, and a great deal of proof was introduced by the defense in support of the motion which will be discussed in further detail hereafter. No additional proof was introduced by the prosecution at the hearing. The trial court denied the motion for new trial, thereby, upholding the defendant's convictions and sentences, and the Court of Criminal Appeals affirmed the trial court's judgment.

Because the trial court completely departed from the statutory procedures which govern selection of a special jury venire and because the sequestered jury was allowed to separate twice daily during the trial, we reverse the defendant's convictions and remand this case for a new trial. We will first address the two issues which require reversal.

---

[8]The hearing on the motion for new trial with respect to ineffectiveness of counsel was equivalent to a post-conviction hearing. We find trial counsel's failure to prepare for and present evidence at the sentencing phase troubling; however, we need not evaluate counsel's representation because we reverse on other grounds.

## II.

### SELECTION OF SPECIAL VENIRE

The defendant contends that he is entitled to a new trial because the trial court flagrantly, unnecessarily, and substantially deviated from the statutory procedure for selecting a special jury venire in this case. According to the defendant, the deviations constitute prejudice to the judicial process and undermine the public's confidence in the administration of justice. We agree. The facts relevant to this issue are briefly summarized below.

The record in this case reflects that only sixty potential jurors reported to court on the first day of jury selection. Within a few hours, twenty-five of the sixty had been excused for various reasons, leaving only thirty-five remaining potential jurors. At that point, the fact that there were not enough potential jurors remaining to seat the panel in this case became apparent. The trial judge then told the court clerk, "I think you better go up there and call in right now. Tell those women to get on the phone and start calling." The trial judge instructed the court clerk to "call in another 125."

Additional potential jurors reported to court the next day, and a jury had been chosen by the fourth day of trial. However, immediately before the jury was sworn, defense counsel Jerry Colley challenged the special venire. In support of his challenge, Colley called the circuit court clerk as a witness. The clerk testified that the chief deputy and one of the deputy clerks had drawn the names of the special venire of 125 from the jury box. Once the names had been drawn, employees of the clerk's office telephoned the potential jurors and instructed the individuals to appear at court for jury service the next day.

In arguing his objection to the trial court, Colley emphasized that he did not particularly want to start all over again with jury selection but cautioned that "we are

courting real danger if we go up in a death case to the Supreme Court, and that Court sees how this panel was selected, we are in trouble." The trial court responded: "I thought we sat, right here in my office, and we all agreed that this was the only way we could proceed with this trial and get these jurors, here. No one raised any objection to doing it that way." Defense counsel replied: "at that time, I did not know that the jury commission wasn't going to draw them, and we were going to limit this to people who had telephones." The trial court overruled defense counsel's challenge to the special venire, stating:

> I'm going to overrule your motion. The defense counsel agreed to this method of selecting the jury. We have a full cross section of the citizens of this county. And the Court is going to overrule your motion.

Following the trial court's ruling, the jury was sworn and rendered a verdict of guilty on the charges. However, the challenge to the special venire was renewed in the defendant's motion for new trial, and additional proof was offered at the hearing on the motion.

The testimony is ambiguous as to exactly who opened the jury box and drew the names for the special venire, but the trial judge clearly did not perform this task. In any event, after the names had been drawn, they were divided among the deputy clerks, who then attempted to match each to a name appearing in the telephone directory. If the name on the jury ticket was found in the telephone directory but the address on the jury ticket did not match the address in the telephone directory, the jury ticket was set aside, and no telephone call was placed. One of the deputy clerks testified that, of the people she attempted to contact, very few were actually contacted because it was "during a working day that we would be calling these people, and you just wouldn't get any response, most of the time, to most telephone numbers that you called." When the deputy clerk was able to contact someone, she

told them "that we had a case going in court and their names had been drawn from the jury box, and that we expected them to come in the next day for jury service."

With respect to this procedure, another deputy clerk testified that she "was successful with some, and some I couldn't reach. Some people I knew, and knew where they worked, so I had called them. I called some of them at work. I knew a few of the people. And then, later on in the afternoon, some of the people called back. They thought that -- they had been called, and they thought it might be a joke and that we didn't call for them. They had never been called that way, before." Another deputy clerk testified that not all 125 people had been contacted by the end of the work day; therefore, she continued calling potential jurors from her home that evening, directing them to appear in court the next day at 9:00 a.m. The proof at the hearing on the motion for new trial also showed that no one had prepared a master list of the names drawn or the names summoned and that no punishment was imposed or accounting required of those who had failed to appear.

Despite this additional proof, the trial court once again overruled the defendant's objection, and the Court of Criminal Appeals affirmed. For the reasons that follow, we reverse.

Initially we note our disagreement with the lower courts' finding that defense counsel acquiesced in the procedure used to select the special venire. The record reflects that defense counsel only acquiesced in the trial court's decision to summon additional potential jurors after jury selection had begun. Defense counsel was unaware of the method used to summon the potential jurors until immediately before the jury was sworn, which was four days into the trial. As soon as defense counsel learned of the method utilized, an objection was interposed. Accordingly, contrary to the decisions of the lower courts, we hold that defense counsel did not acquiesce

in the method used to select the special venire and properly objected to the unauthorized procedure before the jury had been sworn. Tenn. Code Ann. § 22-2-313 (1994 Repl.)("[i]n the absence of fraud, no irregularity with respect to the provisions of this part or the procedure thereunder shall affect the validity of any selection of any grand jury, or the validity of any verdict rendered by the trial jury unless such irregularity has been specially pointed out and exceptions taken thereto before the jury is sworn.") (emphasis added).[9]

In addition, we have also determined that the Court of Criminal Appeals erred in distinguishing this Court's decision in State v. Lynn, 924 S.W.2d 892 (Tenn. 1996),[10] which involved facts quite similar to the circumstances of this case. In that case, the trial court directed the court clerk to draw new names for a special venire after a hearing had disclosed evidence that the original venire was tainted by jury tampering. The court clerk opened the jury box in his office, unsealed it, and drew sufficient names to constitute the special jury venire. Counsel was not supplied a list of the names until immediately before jury selection. Id. at 894.

After reviewing the statutory provisions that prescribe the method by which a special venire is to be selected, this Court held that proof of actual prejudice is not required in circumstances involving flagrant, unreasonable, and unnecessary deviations from those statutory provisions. In so holding, we stated as follows:

---

[9]We note that the defendant also raised a separate challenge to the procedures used to select the original venire in his motion for new trial. The defendant offered proof to establish twenty-five deviations from the relevant statutory procedures. Relying on Tenn. Code Ann. § 22-2-313, the lower courts held that this issue had been waived because the defendant had not objected prior to the time the jury was sworn. We agree with the lower courts' finding that this issue was waived. Before the jury was sworn, the defendant only challenged the procedures used to select the special venire and did not challenge the procedures used to select the original venire. However, we take this opportunity to admonish Maury County officials to carefully and fully comply with the clear and detailed statutes governing jury selection. As we stated in State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993), future continued deviations from the statutory procedures could constitute prejudice to the judicial process.

[10]We note that the trial court did not have the benefit of the Lynn decision when it ruled on the defendant's motion for new trial in this case.

-10-

We do not question the integrity of the court officials in this case. Undoubtedly, their motives and intentions were honorable. We acknowledge that they were called upon to perform an infrequently used procedure, that of impaneling a special venire. Nonetheless, the statutes are explicit. The procedures required are detailed. This judicial proceeding had already been discolored by the trial judge's earlier findings of jury tampering. The fundamental principles of impartiality, disinterestedness, and fairness are even more essential in a case, such as this, in which a previous attempt to circumvent fairness has occurred.

Often, the public sees in our justice system something substantially different from what actually exists. It is the appearance that often undermines or resurrects faith in the system. To promote public confidence in the fairness of the system and to preserve the system's integrity in the eyes of the litigants and the public, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13, 99 L.Ed.11 (1954).

Id. at 898.

While acknowledging the existence of Lynn, the Court of Criminal Appeals in this case stated that Lynn applied "narrowly to the facts of that case. . . [where] there were claims of jury tampering." We disagree and conclude that the holding of Lynn applies with equal force in the context and circumstances of this case. Here, the trial court substantially, flagrantly, and unnecessarily deviated from the statutory procedures, and the defendant objected to the deviations prior to the time the jury was sworn.[11]

Tennessee Code Annotated § 22-2-308(a)(2)(1994 Repl.), provides the following procedures to govern the selection of a special venire:

In the event by reason of the disqualification of proposed jurors, or other cause, the required number of jurors cannot be obtained from the venire, the clerk of the court shall produce in open court the jury box, and the box shall be opened by the court and there shall be drawn

---

[11]The author of this opinion filed a separate dissenting opinion in Lynn on the basis that the defendant in Lynn had objected to the special venire before the jury was sworn, but elected to defer the trial court's decision on the objection until after the trial was completed. Under those circumstances, the error was invited and did not require reversal. In this case, unlike Lynn, the defendant objected before the jury was sworn, and the issue has been properly presented for review on appeal.

therefrom, as directed by the court, the number of names deemed by the judge sufficient to complete the juries. This process shall, if necessary, continue until the grand and petit juries are completed; but the judge of the court instead of following the last mentioned procedure may, if the judge shall deem proper, furnish a sufficient number of names of persons to be summoned to the sheriff, or the judge may, if the judge thinks proper, direct the sheriff to summon a sufficient number to complete the juries.

As we recognized in Lynn, this statute prescribes three options which may be used to select a special venire. The trial judge has the discretion to choose between the three, but if the judge does not select the second or third option, the first option is mandatory. That option requires the court clerk to produce the jury box in open court where the judge is required to open it and direct the drawing of a sufficient number of jurors. Id., 924 S.W.2d at 895.

In this case, as in Lynn, none of these procedures were followed. The trial judge did not attempt to comply with the statutory directives, but, instead, the trial court conceived of and implemented an alternative procedure that was not authorized by law. The jury box was not produced in open court, and the names were drawn by clerk's office employees outside the presence of both the trial judge and the court clerk. As we have previously recognized,

[r]ules prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community. . . . Compliance with the procedure set forth . . . safeguards the judicial process and protects the administration of justice.

Coleman, 865 S.W.2d at 458 (citations omitted). The proof offered by the defendant on this issue clearly illustrates that the method employed in this case denigrated the integrity of the jury system and resulted in a subjective and disorderly selection process.

For example, even assuming that the names were randomly drawn from the jury box by clerk's office employees, the method used to summon potential jurors compromised the randomness of the procedure. The evidence reflects that potential jurors known to the clerk's office employees were called at work while all other potential jurors were called at home. Given the fact that the potential jurors were being called in the middle of a work day, it is much more likely that those actually contacted were potential jurors with whom the clerk's office employees were acquainted. The manner in which this erroneous procedure impugned the integrity of the jury system is sharply illustrated by the fact that some potential jurors believed the telephone "summons" was a joke since they had never before been summoned for jury service in that manner. The fact that potential jurors were aware that the summons procedure was unusual also could have inherently caused jurors to speculate that the defendant was more dangerous or that the alleged crime was more serious than other criminal cases. Also quite troubling is the fact that the special venire was called after jury selection had already begun. The record reflects that a news account of the facts of the case and of the progress of jury selection had been published in a local evening newspaper at the end of the first day of jury selection. Many of the potential jurors who reported on the second day of jury selection in response to the special venire had read the article.[12]

Just as in <u>Lynn</u>, we do not question the integrity, motives, or intentions of the court officials. To the contrary, we realize that the trial court was faced with a dilemma when almost one-half of the original venire was excused after only a few hours of voir dire.[13] However, this dilemma did not empower the trial court to employ an illegal method of jury selection. In serious and highly publicized capital murder

---

[12]Ten of the twelve jurors who rendered the verdict in this case had been exposed to pretrial publicity, though all the jurors stated they had not formed an opinion.

[13]In this highly publicized capital case, it is difficult to understand why only sixty potential jurors were summoned as part of the original venire.

trials, such as this one, meticulous and conscientious adherence to the statutory jury selection procedures is particularly important. Moreover, as the defendant points out, the statute provides two options which the trial court could have used to solve the dilemma. Specifically, Tenn. Code Ann. § 22-2-308(a)(2) allows a trial judge to "furnish a sufficient number of names of persons to be summoned to the sheriff, or . . . . direct the sheriff to summon a sufficient number to complete the juries." These statutory options appear to contemplate situations in which expedited summons are needed.

We have declined to reverse convictions for minor deviations from the statutory jury selection procedure when the deviations are either inadvertent or necessitated by circumstances beyond the trial court's control. However, we will not sanction flagrant and unnecessary deviations. The trial court in this case completely failed to comply with applicable law in choosing the special venire. The deviations were flagrant and unnecessary. As we stated in Lynn, "[t]o promote public confidence in the fairness of the system and to preserve the system's integrity in the eyes of the litigants and the public, 'justice must satisfy the appearance of justice.'" Lynn, 924 S.W.2d at 898, quoting Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13, 99 L.Ed.11 (1954). The procedure employed by the trial court in this case satisfied neither justice, nor the appearance of justice. Accordingly, the defendant's convictions and sentences must be reversed.

## III.

### JURY SEPARATION

Reversal is also required in this case because the defendant offered unrefuted proof showing that the jurors, who were required by law to remain sequestered, were

allowed to separate twice each day to drive their personal vehicles between their lodgings and the courthouse.

In the defendant's initial motion for new trial filed by defense counsel Jerry Colley, the following claim was asserted:

> The trial jury was not properly sequestered throughout the eight day trial in that they were allowed to separate continuously. The jury was quartered at the Holiday Inn in Columbia, Tennessee, some two miles from the Maury County Courthouse where the trial was being held. The jurors were allowed to drive their individually owned automobiles to and from the Holiday Inn each day and were therefore separated numerous times. All of this was prejudicial to the Defendant in that this was a highly publicized trial covered by all of the media including the newspapers, television, and radio. Affidavits are attached hereto to support this ground. The burden is on the State to show a lack of prejudice under the principles outlined in **Gonzales v. State**, 593 S.W.2d 288, and this has not been done.

(Emphasis in original.) The affidavit of Ralph Sands, the court officer responsible for supervising the sequestration of the jurors, was offered in support of the claim. In the affidavit, Sands stated as follows:

> 1. I am Ralph Sands, court officer for the Circuit Court of Maury County, Tennessee, and one of my duties in December, 1991, was securing, isolating, transporting, and generally supervising the sequestration of the twelve-person jury and alternates in the Pat Bondurant capital murder case.
>
> 2. From the beginning of jury selection on Monday, December 2, 1991, until the jury was excused on Wednesday, December 11, 1991, the jurors were sequestered and boarded at the Holiday Inn, Nashville Highway, Columbia, Tennessee. The Holiday Inn is 2.5 miles from the Maury County Courthouse.
>
> 3. The jurors were allowed to travel to and from their motel to the Courthouse separately and alone or in pairs in their own private vehicles.
>
> 4. Each and every day Court was held, the jurors traveled separately and alone or in pairs to the Courthouse parking lot in the morning and then back to the motel in the same fashion in the afternoon. In the morning, I would wait until all of the jurors had arrived and then we would walk in one group to the Courthouse; in the afternoon, we would depart as one group from the Courthouse to the parking lot. Anyone in the Courthouse would think that the jurors were being transported as a group to and from their lodgings at the motel.

5. I had no control over the jurors during their travels between the Courthouse and their motel nor did I have any knowledge of their activities during those travels or the stops they may have made, if any, during those travels.

This affidavit was filed on February 19, 1992, and the defense relied upon the affidavit at the hearing on the motion for new trial held in October of 1994. The State offered no proof to rebut the defendant's prima facie showing of jury separation.

Initially we note that at common law, the sequestration rule required that jurors be physically kept together within the presence of each other without food, drink, fire or light until a verdict was agreed upon. State v. Gonzales, 593 S.W.2d 288, 2922 (Tenn. 1980); Annotation, Separation of Jury in Criminal Case, 34 A.L.R. 1115, 1117 (1925). The common law rule has been greatly relaxed, and currently, sequestration is a creature of statute. Mary Strauss, Sequestration, 24 Am.J. Crim. L. 63, 70 (Fall 1996). Moreover, under modern law, the test of keeping a jury "together" is not a literal one, requiring each juror to be at all times in the presence of all others. The practical needs of personal hygiene and separate rooms for sleeping, if nothing else, preclude such a literal application. The real test is whether a juror passes from the attendance and control of the court officer. State v. Bartlett, 407 A.2d 163, 166 (Vt. 1979).

Although the sequestration rule is no longer literally applied, the purpose of the rule -- to preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial -- is perhaps more important in the modern age, considering the pervasiveness of media coverage and publicity. 23A C.J.S. Criminal Law § 1363(a) (1989). Many years ago, this Court emphasized that "[t]oo much strictness cannot be used to keep a jury charged with the life or liberty of a citizen, from mingling with the community during their deliberations, and this the more especially where there

is any excitement for or against the prisoner." <u>Cochran v. State</u>, 26 Tenn. (7 Hum.) 544, 547 (1847).

At the time of this trial,[14] and currently,[15] sequestration of jurors is required in capital cases. It is well-settled in Tennessee that once separation of a sequestered jury has been shown by the defendant, the State has the burden of showing that such separation did not result in prejudice to the defendant. <u>Gonzales</u>, 593 S.W.2d at 291. "'It is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial.'" <u>Gonzales</u>, 593 S.W.2d at 291, quoting <u>Cartwright v. State</u>, 80 Tenn. 620 (1883). If the State fails to meet the burden of showing that the separation did not result in prejudice, a new trial is required. <u>Id.</u>

The leading modern Tennessee case on the issue of jury separation is <u>Gonzales</u>. However, the rule applied therein had been well-established in Tennessee for over one hundred years prior to the decision in <u>Gonzales</u>. For example, in <u>McLain v. State</u>, 18 Tenn. (10 Yer.) 241 (1837), this Court stated:

> That the person accused may have the full benefit of a judgment by his peers, it is absolutely necessary that the minds of the jurors should not have prejudged his case, that no impression should be made to operate on them, except what is derived from the testimony given in court, and that they should continue impartial and unbiased. These objects can only be obtained by selecting those who have no preconceived opinion as to the guilt or innocence of the prisoner, and by not permitting them to separate from each other after they have been sworn, and mingle with the balance of the community. <u>It is not</u>

---

[14]At the time of the defendant's trial, the sequestration statute provided as follows: "In all criminal prosecutions except in those in which a death sentence may be rendered, the judge of the criminal court may, in his discretion, with the consent of the defendant, and with the consent of the district attorney general, permit the jurors to separate at times when they are not engaged upon the actual trial or deliberation of the case." Tenn. Code Ann. § 40-18-116 (1982 Repl.).

[15]Currently, the sequestration statute provides as follows: "In all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered on the judge's motion or on the motion of the counsel for the defendant or the district attorney general, which shall prohibit the jurors from separating at times when they are not engaged upon the actual trial or deliberation of the case. The party making the motion to sequester shall be unknown to the jury." Tenn. Code Ann. § 40-18-116 (1997 Repl.).

> necessary for the prisoner to prove that they were, during their absence, subjected to improper influence from others; it is sufficient if they might have been. There would be no safety in a different rule of practice, for it would be almost impossible ever to bring direct proof of the fact that it was done.

Id. at 241-42 (emphasis added); see also Hines v. State, 27 Tenn. (8 Hum.) 597, 602 (1848); Cartwright v. State, 80 Tenn. (12 Lea) 620, 625 (1883); Sherman v. State, 125 Tenn. 19, 58, 140 S.W. 209 (1911); Hickerson v. State, 141 Tenn. 502, 213 S.W. 917 (1918); Steadman v. State, 199 Tenn. 66, 70, 282 S.W.2d 777, 778-79 (1955).

Therefore, applying this longstanding Tennessee precedent to the facts in this case, we conclude that the defendant has established a prima facie showing of jury separation. Contrary to the State's assertion, the proof in this record establishes more than "the possibility of a separation." The facts of this case are not at all analogous to a situation where jurors occupy separate hotel rooms under the watchful eyes of officers sworn to supervise the sequestration of the jury. See State v. McClain, 667 S.W.2d 64 (Tenn. 1984). As was previously stated, the key is whether a juror is outside the presence and control of a court officer. Officer Sands clearly and unequivocally stated in his affidavit: "I had no control over the jurors during their travels between the Courthouse and their motel nor did I have any knowledge of their activities during those travels or the stops they may have made if any during those travels." Interestingly, the facts of the affidavit regarding jury separation are convincingly, though perhaps inadvertently, corroborated by an order of the trial judge reimbursing jurors twenty-two cents per mile for the expense they incurred during the trial traveling between the hotel and the courthouse. Accordingly, we reject the State's assertion that this case presents only the possibility of a separation and not an actual separation.

We also reject the State's argument that a defendant must show an actual "mingling with the community" to establish a separation. Over one hundred years ago this Court stated the applicable standard: "[i]t is not necessary for the prisoner to prove that they [the jurors] were, during their absence, subjected to improper influence from others; it is sufficient if they might have been." McClain, 18 Tenn. at 241-42; see also 17 Tenn. Juris. Jury § 42 (1994). The proof in this record clearly meets that standard.

Having concluded that the defendant offered proof to establish the fact of a jury separation, ordinarily, we would next review the record to determine if the State met its burden of proving that the separation did not prejudice the defense. However, because the State in this case did not offer any proof in response to the defendant's new trial motion, the State obviously has not satisfied its burden. In light of the longstanding authority requiring the State to rebut a showing of separation, we are bewildered by the State's complete inaction in this case. Certainly, the State could have attempted to rebut the claim of jury separation by calling the jurors as witnesses at the hearing on the motion for new trial and questioning them as to whether they had any improper contacts or were influenced by any publicity or extraneous information during the separation. There is certainly precedent for such a hearing.[16]

We note that the defendant's motion for new trial and the affidavit of Officer Sands were filed more than two years before the hearing on the motion was conducted. Therefore, the State had ample time to muster its proof. Nonetheless, the State, for whatever reason, did not offer any proof in this case to rebut the prima

---

[16]In State v. King, 694 S.W.2d 941 (Tenn. 1985), another death penalty case which was tried in Maury County, the jury was allowed to drive their personal automobiles from the hotel to the courthouse on the last day of trial. The defendant raised this separation in his motion for new trial. As a result, the trial judge held an extensive hearing. In response to questions by the trial judge, the State, and the defense, "[e]ach juror testified positively . . . that there was no interference, no outside contact, and no improper suggestion made to them." Id. at 946. Based upon that proof, this Court rejected King's claim that his conviction and sentence had to be reversed because of a jury separation.

facie showing of jury separation. As we have previously stated, this was a highly publicized case, and, according to the record, the trial was being closely followed by the local newspaper and the Nashville television news organizations. In the face of this clear showing of jury separation and in the absence of countervailing proof from the State, we are unable to conclude that the jury separation error was harmless. The risk that jurors were influenced by extraneous information or based their decision on facts that were not developed at trial is simply too great. Accordingly, a new trial is required.

Given the fact that the General Assembly has mandated sequestration of jurors in capital cases, we take this opportunity to urge trial judges to use all available measures to comply with this legislative mandate. We particularly encourage trial judges to ensure that local law enforcement officials transport the jury in a manner that will not compromise sequestration. We are in agreement with the well-known maxim -- an ounce of prevention is worth a pound of cure. In other words, if trial courts will fastidiously enforce compliance with the procedural protections designed to eliminate prejudice at its inception, the errors which require reversal in this case will not arise again.

## IV.

### DISCRIMINATION - GRAND JURY FOREPERSONS

Having concluded that a new trial is required, we will next address the defendant's claim that his indictment should be quashed because of racial discrimination in the selection of grand jury forepersons in Giles County. In support of his claim, the defendant says that although African-Americans comprise twelve percent of the adult population in Giles County, no African-American served as foreperson of the grand jury in Giles County from 1919 to 1990. The defendant

introduced statistical data to show that this is an absolute disparity of sixteen percent, a comparative disparity of thirty percent, and a discrepancy of almost twenty standard deviations. As legal support for his assertion, the defendant relies upon Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979).

The trial court and the Court of Criminal Appeals rejected the defendant's claim and found that grand jury forepersons in Tennessee are ministerial and co-equal with other grand jurors; therefore, to establish a prima facie equal protection claim, Tennessee defendants must offer proof that racial discrimination tainted the entire grand jury. We agree.

An identical claim was raised by the defendant in State v. Jefferson, 769 S.W.2d 875 (Tenn. Crim. App. 1988) (perm. app. denied April 3, 1989). The intermediate appellate court in Jefferson fully considered the relevant case law and rejected the defendant's claim, stating as follows:

> In Tennessee, the foreman is the spokesperson for the grand jury and has the same voting power as any other grand jury member. Bolen v. State, 544 S.W.2d 918, 920 (Tenn. Crim. App. 1976). Not only does the foreman not have the power to veto an indictment, his authority, within this context, is no greater than any other member of the grand jury venire. State v. Collins, 65 Tenn. 151, 153-54 (1873); See also Applewhite v. State, 597 S.W.2d 328 (Tenn. Crim. App. 1979); Bird v. State, 103 Tenn. 343, 52 S.W. 1076 (1899); State v. Chambless, 682 S.W.2d 227 (Tenn. Crim. App. 1984). The above holding is bolstered by the observation of this Court in State v. Chambless that the Supreme Court in United States v. Hobby, [468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984)] "greatly exaggerated" the powers of the Tennessee grand jury foreman.

> Secondly, again with all due respect, we agree with the State's contention that the Supreme Court's interpretation of the role and power of the grand jury foreperson in Tennessee is the result of a misperception commencing with footnote 2 in Rose v. Mitchell, supra, and carried over without any other citation in Hobby v. United States, supra. Rose involved a federal habeas corpus proceeding wherein Tennessee litigants claimed they were victims of racial discrimination, in violation of the equal protection clause of the Fourteenth Amendment, in the selection of the grand jury which indicted them for murder in the first degree. At issue was the question of whether the claim of the grand jury discrimination constituted harmless error when

-21-

raised by a defendant found guilty beyond a reasonable doubt by a petit jury trial, free of reversible error.

Clearly, the role or power of Tennessee's grand jury forepersons was not at issue in Rose and no evidence was adduced at trial related thereto. The Supreme Court in Rose did state that for the purposes of that case it could be assumed that the Tennessee method of selecting a grand jury foreperson suggests potential for abuse. 443 U.S. at 566, 99 S.Ct. at 3005. However, nowhere in the majority opinion does the Court in Rose conclude that the Tennessee grand jury foreperson has virtual veto power over the indictment proceedings.

Hobby v. United States, supra, which did not involve Tennessee litigants or matters of Tennessee law, decided the narrow question of whether discrimination in the selection of a federal grand jury forepersons required reversal of a valid conviction of a white male and the dismissal of the indictment against him. 468 U.S. at 340, 104 S.Ct. at 3094. Although the Court in Hobby did not address an issue of Tennessee law, it appears to have given rise to a misperception and groundless assumption of the authority of the grand jury foreperson in Tennessee. See 468 U.S. at 346-47, 104 S.Ct. at 3097-98. With deference to our United States Supreme Court, in Hobby it appears that the Court relied merely upon the aforementioned footnote in Rose, without citation to authority, and surmised that the Tennessee grand jury foreperson had powers greater than those bestowed by statute or exercised de facto.

Jefferson, 769 S.W.2d at 877-78.

We agree with intermediate appellate court's discussion of Rose and Hobby and therefore hold that the role of the grand jury foreperson in Tennessee is ministerial and administrative. We also reject the defendant's claim that Campbell v. Louisiana, __ U.S.__, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) requires that the indictment be quashed. As we read Campbell, the method of selection of the grand jury foreperson is relevant only to the extent that it affects the racial composition of the entire grand jury. Here, the defendant offered no proof as to the racial composition of the entire grand jury. In addition, we note that the disputed issue in Campbell was whether a white defendant has standing to claim discrimination against African-Americans in the selection of grand jurors. Louisiana law, rather than Tennessee law, was at issue. Accordingly, we hold that the defendant has failed to establish a prima facie claim because he failed to offer proof showing that racial

discrimination tainted the entire grand jury. We, therefore, reject the defendant's claim that his indictment must be quashed.

# V.

## PRETERMITTED ISSUES

Because of the necessity of a new trial, some issues raised on this appeal, such as errors alleged to have occurred during voir dire and the question of the proportionality of the defendant's sentence, are pretermitted as moot. However, because certain aspects of several issues may become relevant upon retrial, we offer the following guidance to the trial court and trial counsel.

With respect to the alleged violation of the marital privilege resulting from Denise Bondurant's testimony, we note that a statute defining the marital privilege was enacted while this case was pending on appeal. See Tenn. Code Ann. §24-1-201 (Supp. 1998). We express no opinion on the effect or application of the statute to this case.

On this appeal, the defendant has complained of allegedly erroneous references during his trial to the murder of Gwen Dugger, the death of Terry Lynn Clark, and the discovery of Clark's body at a house owned by the defendant's brother. We caution that at any new trial, references to Dugger's murder and Clark's death should be admitted only when and if relevant to an issue in dispute. However, a scenario under which it would be relevant or necessary to mention that Clark's body was found in Pete Bondurant's home is difficult to imagine.

The defendant also complained of error regarding the State's impeachment of the defendant with his prior murder conviction. In this respect, we direct counsel

and the trial court to Tenn. R. Evid. 609 and to this Court's recent decision in State v. Mixon, 983 S.W.2d 661, 673 (Tenn. 1999).

The defendant has alleged that several errors occurred during the sentencing phase of his trial. We agree with the Court of Criminal Appeals that most of the defendant's claims of instructional error at the sentencing phase have been previously considered and rejected by this Court. For example, we have repeatedly upheld the constitutionality of the (i)(5) aggravating circumstance, which the defendant challenges in this appeal. Strouth v. State, ___ S.W.2d ___ (Tenn. 1999); State v. Middlebrooks, ___ S.W.2d ___ (Tenn. 1999). However, the State has conceded in this Court that there is no proof in this record to support a jury finding of torture because there is no proof to establish that the victim was conscious during the beating allegedly perpetrated by the defendant. See, e.g., State v. Mann, 959 S.W.2d 503 (Tenn. 1997)(stating that torture requires proof that the defendant inflicted severe physical or mental pain on the victim while the victim was alive and conscious). If the State relies upon the (i)(5) aggravating circumstance at the new sentencing hearing but does not offer additional proof to establish that the victim was conscious when beaten, see State v. Harris, 919 S.W.2d 323, 331 (Tenn. 1996)(holding that the State may offer additional evidence at re-sentencing in support of an aggravating circumstance that was relied upon at the original sentencing hearing), the jury should be instructed only as to the depravity of mind portion of the aggravating circumstance--that the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind. See State v. Van Tran, 864 S.W.2d 465, 479 (Tenn. 1993)(holding that the trial court correctly deleted "torture" from its instruction

to the jury since no evidence supported a finding of "torture" as that term has been defined).[17]

Finally, with respect to the claims of ineffective assistance of counsel raised on this appeal, we emphasize that counsel has a duty to investigate and prepare for both the guilt and sentencing stages of a capital trial. Goad v. State, 938 S.W.2d 363 (Tenn. 1996). In preparation for a new trial in this case, defense counsel obviously should review and consider the evidence in this record offered at the hearing on the motion for new trial in support of the claim that former counsel were ineffective. In addition, upon remand, the need for another change of venue ought to be carefully reassessed given the publicity that has been focused upon this case in Maury County. Compare State v. Smith, 857 S.W.2d 1, 26 (Tenn. 1993)(Daughtrey, J., concurring and dissenting)(exhorting the trial court and counsel to consider whether another change of venue would be warranted for the third re-sentencing hearing).

## VI.

### CONCLUSION

Because the trial court totally disregarded the statutory procedures governing selection of a special jury venire and because the sequestered jury was allowed to separate twice daily, we conclude that the defendant's convictions for first degree murder and arson must be reversed and the case remanded for a new trial. Costs of this appeal shall be paid by the State of Tennessee.

_____

[17]We note that the language of the pre-1989 aggravating factor is applicable in this case since the offense was allegedly committed in 1986. See State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994)(jury should be instructed in accordance with the law in effect at the time the offense was committed).

FRANK F. DROWOTA, III,
JUSTICE

**Concur:**
Anderson, C.J.,
Birch, Holder, Barker, JJ.