IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2009

## STATE OF TENNESSEE v. APRIL JENNIFER WARREN

**Appeal from the Circuit Court for Blount County**
**No. C-15710     Michael H. Meares, Judge**

---

**No. E2008-01135-CCA-R3-CD - Filed December 1, 2009**

---

The Defendant, April Jennifer Warren, was convicted upon her guilty plea in the Blount County Circuit Court of voluntary manslaughter, a Class C felony. Pursuant to a plea agreement, the Defendant received a Range II, ten-year sentence with the manner of service to be determined by the trial court. At the sentencing hearing, the trial court ordered the Defendant to serve the sentence in confinement. The Defendant appeals, contending that the trial court erred in denying alternative sentencing. Based upon conduct by the trial judge, we reverse the judgment of the trial court and remand the case for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); and Raymond Mack Garner, District Public Defender, and Stacey D. Nordquist, Assistant Public Defender (at trial), for the appellant, April Jennifer Warren.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Michael L. Flynn, District Attorney General; Tammy M. Harrington, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the killing of Charles Russell by the Defendant, who was his live-in girlfriend. At the sentencing hearing, the presentence report was received into evidence. The victim's sister, Lisa Blair, testified to the impact the victim's death had on her family and asked the trial court to sentence the Defendant to ten years in confinement.

Doctor Darinka Mileusnic-Polchan, Chief Medical Examiner for Knox County, testified that she performed an autopsy on the victim. She said the "cause of death was a single shotgun wound to the left temple, which involved the eyes and the brain and perforated the skull." She said the victim's injuries were consistent with a tight contact shotgun wound, meaning the shotgun barrel was close, but not necessarily touching the skin. She said the victim would have lost consciousness immediately and would have died within a couple of minutes. The autopsy report and a photograph of the victim's shotgun wound were received into evidence.

The Defendant's mother, sisters, and brother testified that the victim and the Defendant fought often and that the Defendant usually had injuries all over her body. All admitted the Defendant had substance abuse problems. All said the Defendant would leave the victim after a fight and stay with them several times a week. The Defendant's brother, Eddie Warren, testified that he saw the victim push the Defendant, pull a gun on her, and "whip[]" a beer can at her. The Defendant's sister, Dulcie Gunter, testified that the victim swung a baseball bat at the Defendant and at her. Another sister, Wendy Warren, said that when she asked the victim's and the Defendant's daughter why the girl had laid a pillow over a doll and stomped on it, the girl replied, "That's what Daddy does to Mama." Ms. Warren said the Defendant told her the pillow lessened the bruising. Andrea Sutfin, Eddie Warren's fiancée, testified that she saw the victim kick and slap the Defendant while the Defendant lay on the floor and that Mr. Warren had to pull the victim off the Defendant.

Shari Garner testified that she owned Subway restaurant in Vonore, Tennessee, and that the Defendant had worked for her off and on for two years. She said the Defendant was currently employed as an assistant manager. She described the Defendant as a good employee and agreed the Defendant would be reliable if granted probation.

Jessica Keith testified that she worked with the Defendant at Subway and that she was the victim's third cousin. She said the Defendant often had bruises and choke marks on her neck. She said the victim would repeatedly call the Defendant at work and argue. She said that on her manager's instruction, she once refused to let the victim talk to the Defendant and that the victim threatened to drive his truck through the restaurant. She said the victim had pushed the Defendant out of his truck, had pulled a gun on the Defendant, and had removed the license tags from the Defendant's car to prevent her from driving home.

The Defendant testified that she had a GED and had completed two years of classes at Pellissippi State Community College. When asked about alcohol and drug abuse, she admitted she started using alcohol at thirteen or fourteen years old and cocaine at eighteen or nineteen years old. She said that she stopped drinking and using cocaine in her twenties but that she started using both again after she began dating the victim in 1999. She said they moved in together after dating five months. She could not explain why she attended only two classes at Bradford Health Services after she was admitted for alcoholism in 1993. She confirmed that the two drug screens she had taken since the shooting were negative. She said she started working at Subway restaurants in 1999 or 2000. She said that the job would become stressful, that she would leave the position, and that she

would return. She said that in between her jobs at Subway, she worked for her father and in construction.

The Defendant testified there were instances of violence before she moved in with the victim. She said the victim grabbed her hair and slammed her face into the front of his truck. She said that the victim's ex-wife claimed the victim had hit her but that the ex-wife did not give any details. She said she knew the victim had been charged with domestic violence. She described several instances when the victim beat her, including kicking her in the stomach when she was pregnant. She said she did not call the police or leave the relationship because she loved the victim and did not want him to get into trouble. She said that they both used alcohol and crack cocaine and that much of the abuse occurred when the victim was intoxicated.

The Defendant testified that on the day of the shooting, she had gone to the doctor for a checkup following treatment she had received for a tubal pregnancy. She said that she returned home about 4:00 p.m. and that she drank some wine but did not take illegal drugs. She said that the victim was already at home and that he was drinking beer. She said that they left to go pick up the victim's paycheck, that they stopped at the dollar store, and that the victim remained in the car while she went inside. She said she observed a man she knew as a crack dealer talking to the victim, although she did not see an exchange. She said they returned home about 6:00 p.m. and smoked crack. She said that a friend of hers called wanting to buy marijuana and that the victim left to purchase some for the friend. She said that the victim called her to tell her he was on his way home and that when he did not return immediately, she called her sister to see if the victim was there, which he was. She said that when the victim returned home, they fought but that she could not remember about what. She said that the victim ordered her to leave and that as she took some belongings to her car, the victim grabbed her by the hair. She said that the victim released her and pushed her from behind as she walked out the door and that her belongings spilled onto the ground. When asked what she was thinking at that moment, she replied, "I was mad and sad and just tired." She said that she walked into the house and that she could barely remember going to the gun cabinet and grabbing the gun. She said she thought she grabbed shotgun shells. She recalled walking into the bathroom and closing the gun. She said the next thing she remembered was watching the victim fall backwards.

The Defendant testified that she did not remember the gun firing. She said the gun was the same one the victim had pointed at her on several occasions. She said she had never fired the gun and her intent had been to scare the victim, not kill him. She said that she was tired of being the one always made to leave and that she had wanted him to leave that time. She said that after the victim fell, she dropped the gun and called 9-1-1. She said that the 9-1-1 operator instructed her on how to perform CPR on the victim. She said that the police arrived and that she talked to an officer. The 9-1-1 recording and a responding officer's in-car video were received into evidence. She said that she spoke to officers the next day and that they took pictures of her bruises.

The Defendant testified that she had been convicted of driving under the influence (DUI) and driving on a revoked license but that she had no convictions for felonies or violent crimes. She said

that she was responsible for the victim's death but that she had not planned the crime. She agreed she gave her consent to search her car and trailer and gave a blood sample because it was "the right thing to do." She said that she was still working as an assistant manager at Subway and that she had not been arrested for anything since the shooting. She said that her driver's license had been reinstated and that nothing prevented her from meeting with a probation officer. She said she lived with her mother. She agreed to attend alcohol, drug, or mental health assessments if the trial court determined that she needed to do so. On cross-examination, the Defendant testified that she could not remember whether the victim said anything to her immediately before he was shot. She admitted that after her release on bond, she used marijuana three or four times over a period of months. She said she believed the shooting was an accident, but she could not remember exactly what happened.

In the State's rebuttal, the victim's stepson, Daniel Ty Nguyen, testified that he saw the victim push the Defendant when the Defendant threatened to cut his telephone line in retaliation for his putting too much laundry detergent in the washing machine. On cross-examination, Mr. Nguyen said that on two occasions, he saw the Defendant slap the victim in the face. He said that the Defendant drank every day and used marijuana and that he found crack cocaine in a can under the bathroom sink. He said that his stepfather drank alcohol but that he never saw his stepfather use illegal drugs. On redirect examination, Mr. Nguyen testified that marijuana plants were grown inside the Defendant's closet. He said he did not know for sure whether they were grown by the victim or the Defendant.

Kenneth King testified that he had a relationship with the Defendant from September 2006 to December 2007 and that he saw her smoke marijuana perhaps five times at her sister's house. He said the Defendant would become belligerent when she drank alcohol and would want to fight. He said that the Defendant would push and punch him and that twice he pushed her. On cross-examination, Mr. King testified that he had proposed to the Defendant and that the Defendant had accepted. He said that he rented a trailer from the Defendant's father and that he had filed a lawsuit against the Defendant's father for $8,000 he claimed he had paid toward the purchase of the trailer. He said the Defendant's father had served him with an eviction notice. He said he was sober when he threw the Defendant into a television console. He would not agree that the Defendant ended the relationship. On redirect examination, he explained the Defendant's father bought the trailer for him and the Defendant. On recross-examination, Mr. King clarified that the Defendant's father was trying to evict him and the woman with whom he was now living.

In the defense's surrebuttal, the Defendant testified that she was not growing marijuana in her closet and that she gave police consent to search her house on the night of the shooting. She agreed that the police had not asked her anything about marijuana in her closet. She acknowledged that after the shooting she removed a can containing crack cocaine from under the Defendant's bathroom sink but that she left a can containing crack cocaine under her sink. She said that her father owned the trailer in which Mr. King lived and that she and Mr. King paid rent to her father. On cross-examination, the Defendant denied that she had ever hit or slapped Mr. King or the victim. She said that she did not have the gun to the victim's head, that the victim was standing at the toilet, and that she was standing in the middle of the bathroom. She testified that a diagram and a

photograph she was shown accurately depicted the location of the victim's body after he had been shot. She said she did not move the victim's body.

The Defendant's mother, Dolores Warren, testified that her husband had purchased a trailer for Mr. King and the Defendant. She said Mr. King was supposed to pay the mortgage. She said that the mortgage company contacted her husband and informed him that they had not received payments for four months. She said her husband sent Mr. King a notice of eviction for non-payment of rent.

The trial court found that the Defendant acted under strong provocation and that the Defendant's calling 9-1-1 and consenting to a search were mitigating factors. The court also found that the Defendant exhibited true remorse for her actions. The court considered the Defendant's potential for rehabilitation and treatment and noted that the Defendant quit a drug and alcohol treatment program after attending two classes. The court also considered the Defendant's prior criminal conduct, her illegal drug use, and her recent history of working. The court noted that the Defendant continued to use alcohol and marijuana, but not cocaine. The court found that the Defendant exhibited a sustained intent to engage in a lifestyle of drugs and alcohol that played a role in the offense and that the Defendant had no hesitation in committing a crime where the risk of loss of human life was high. The court found the seriousness of the offense was great. Coupled with the Defendant's continued use of marijuana and alcohol after the victim's death, the court concluded that the Defendant had not accepted responsibility for her actions and that a sentence to probation would be inappropriate. The court sentenced the Defendant to serve ten years in the Department of Correction.

On June 23, 2008, the trial court conducted a hearing on the Defendant's motion for bond pending appeal. The Defendant's mother, Dolores Warren, testified that with the permission of the bail bondsman, the Defendant had traveled out of state and had returned. She said the Defendant continued to work at her job. She said she knew of nothing that would prevent the Defendant from reporting to a probation officer. She said that the Defendant kept her appointments with defense counsel and that she had not missed a court appearance. She said that the Defendant's original bond was $125,000 and that the Defendant would be living at her house if the Defendant were released on that bond. She said she had unsupervised visitation with the Defendant's daughter every other weekend. On cross-examination, Ms. Warren testified that during the time the Defendant had been on bond, the Defendant sometimes stayed with her boyfriend or with other family members. She agreed that she was supposed to supervise the visitation between the Defendant and the Defendant's daughter. When asked whether she had allowed the Defendant and the Defendant's daughter to be together unsupervised, she replied that a responsible adult was present "every time I know of." She agreed she heard testimony at the sentencing hearing about the Defendant's using drugs and alcohol while on bond, but she said she never saw it. She agreed that the Defendant had engaged in behavior of which she had been unaware.

The Defendant testified that while she was released on bond, she stayed with her mother and at Kenneth King's trailer, which was owned by her father and was located two trailers away from

her parents' house. She agreed that no conditions of her bond required her to stay at her mother's house. She said that if the trial court ordered it, she would be willing to live at her mother's house pending appeal. She said that she had received permission from her bondsman to travel out of state and that she had checked with him as required. She said she had worked for Subway companies for about seven years before she started working at Sheri Garner's Subway restaurant. She confirmed that she was employed as an assistant manager and that she was responsible for running the restaurant. She agreed that a custody battle over her daughter was ongoing and that she never took her daughter anywhere without her mother's knowledge and without another adult who had received her mother's consent, as required by the juvenile court.

The Defendant testified that she had a conviction for DUI from 1994, that she was sentenced to supervised probation, and that she had completed probation. She said she never missed a meeting with her probation officer or a court appearance. She said that since her release on bond in 2005, she had never missed a court appearance and had never failed a drug test. She agreed to undergo drug testing, alcohol and drug assessment, and alcohol and drug treatment if ordered by the court as a condition of her release on bond. She agreed that in the three years she had been out on bond, she had not acquired any new charges. She said she would do anything necessary to be released until her appeal was heard.

On cross-examination, the Defendant agreed that she had never faced a prison sentence and that her circumstances had changed since the last time she appeared in court. She said that before Kenneth King moved into the trailer owned by her father, she sometimes stayed at his residence when he was out of town. She said that she stayed with William Newton "a couple of times through the week" and that she sometimes stayed with her sister. She said that her mother did not know she was using alcohol and drugs and that she got the drugs from a friend. She agreed she was never around her daughter without another adult supervising the contact. On redirect examination, the Defendant testified that no revocations of bail had been filed against her and that there were no bond conditions against her drinking alcohol.

The trial court revoked the Defendant's bond pending appeal. The court stated that it had intended to revoke the Defendant's bond at the sentencing hearing and that "if it[] had failed to do so, it would issue or amend its prior orders to make clear that that was the effect of the Court's ruling at the sentencing." The court noted the seriousness of the offense and "the failure of the Defendant to truly accept responsibility at the sentencing hearing and her continued criminal behavior." The following exchange then occurred:

> [DEFENSE COUNSEL]: Your Honor, just very briefly, if I may ask this, did the Court go by any statutory authority to revoke her bond today?
>
> THE COURT: I have considered all your arguments and the statutes you cited.

-6-

| | |
|---|---|
| [DEFENSE COUNSEL]: | Okay. So, the statutes that I stated today? |
| THE COURT: | And is this not a matter totally within the Court's discretion? |
| [DEFENSE COUNSEL]: | I don't–I don't know that. That's what I was asking the Court, if it was going under something specific– |
| THE COURT: | Well, I've made my ruling. If you care to take it up, you're welcome to do that. |

After the Defendant appealed the trial court's denial of alternative sentencing and denial of bond pending appeal, evidence of possible improper conduct by the trial judge came to light. Upon the Defendant's motion, this court stayed the Defendant's appeal, reversed the trial court's ruling denying bond pending disposition of the proceedings on remand, and remanded the case for appointment of a special judge to conduct an evidentiary hearing to determine whether the trial judge engaged in improper conduct and whether he should be disqualified from presiding over the Defendant's case. The facts surrounding the trial judge's conduct are summarized in the special judge's October 20, 2008 Findings and Conclusions:

> On July 28, 2008, there appeared in the Maryville Daily Times a letter to the Editor from Lori Barnes, the sister of the deceased[]. This letter praised the conduct of the trial court in sentencing the defendant to the maximum sentence. The letter also stated Ms. Barnes['s] intention [for] her family to vote for and [to] support . . . the trial judge in the upcoming election to be conducted on August 7, 2008. Also appearing in the July 28 edition of the Maryville Daily Times was another letter of support for the trial judge by another victim of a homicide case. Both of these cases had been prosecuted by Ms. Tammy Harrington, Assistant District Attorney for Blount County Tennessee. Ms. Harrington was concerned that the Barnes family might be upset with the manner in which her office prosecuted this murder. As a result, Ms. Harrington called Ms. Barnes about the July 28 letter. During the course of this conversation, Ms. Barnes revealed that the trial court had contacted her by phone. The trial court had inquired if the family was satisfied with the sentence and if so, would the family write a letter in support [of] the trial judge's upcoming election. The trial court also inquired if she was a registered voter. Ms. Harrington disclosed this information to defense counsel.

Ms. Barnes cannot recall all of her conversation with Ms. Harrington. Ms. Barnes does state that the trial court did contact her by cell phone stating that he was in her area campaigning and requested a visit. A visit was arranged and some discussion between the trial court and Ms. Barnes ensued. During this discussion, the trial court explained some of the prior rulings. She does not recall how the question of the family "satisfaction" with the sentence became part of the conversation. Ms. Barnes also stated that it was the family's idea[] to write a letter in support of the trial judge. After this meeting, the trial judge did not disclose to counsel that he had met with Ms. Barnes despite the fact that this case was on appeal. The Court finds that Ms. Harrington's recollection of Ms. Barnes' version of the encounter with the trial court to be [the] more credible and reliable version.

Nevertheless, the pertinent finding[] for this order is that the trial court initiated a meeting with the family [o]f the deceased. At this meeting, some aspects of this matter were discussed. This case was not final, Notice of Appeal having been filed on May 30, 2008. After the meeting with the trial court, Ms. Barnes' letter of public support appeared in the local newspaper. Finally, the trial court did not disclose his meeting with Ms. Barnes to counsel.

The special judge found that the trial judge had violated Canon 2 of the Code of Judicial Conduct by engaging in ex parte communications with one of the victim's family members and that the trial judge was disqualified from continuing to preside over the case. He ordered a new bond hearing. The special judge also found that appearances of impropriety supported the conclusion that the trial judge's personal or political reasons may have motivated his decision at the sentencing hearing to the Defendant's prejudice and that another sentencing hearing might be appropriate. Based on these findings and conclusions, the Defendant filed a motion asking this court to remand the case for resentencing. The State opposed the motion, and this court ordered the parties to file supplemental briefs addressing the issue.

In her supplemental brief, the Defendant argues that her case should be remanded for a new sentencing hearing on the basis of the appearance of partiality of the original sentencing judge. The State now does not oppose the Defendant's request to remand for resentencing.

"The fundamental principles of impartiality, disinterestedness, and fairness" are central to our justice system. State v. Bondurant, 4 S.W.3d 662, 668 (Tenn. 1999) (quoting State v. Lynn, 942 S.W.2d 892, 898 (Tenn. 1996)); see also Offutt v. United States, 348 U.S. 11, 14 (1954). A fair trial is a basic requirement of due process, and a trial before a biased or prejudiced judge is a denial of due process.

Leighton v. Henderson, 414 S.W.2d 419, 421-22 (Tenn. 1967); In re Cameron, 151 S.W. 64, 76 (Tenn. 1912). The appearance of bias or prejudice is enough to trigger a judge's recusal "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). A judge should grant a motion to recuse whenever his or her impartiality might reasonably be questioned. Id.; Code of Judicial Conduct Canon 3.E.(1), Tenn. Sup. Ct. R. 10.

In this case, the facts that formed a possible basis for the trial judge's recusal were not uncovered until after the Defendant had been sentenced and had appealed the denial of alternative sentencing to this court. The trial judge sentenced the Defendant to ten years' confinement, the manner of service requested by the sister of the victim in the homicide case. The trial judge then contacted the victim's sister and asked her to write a letter to the editor of the local paper in support of his upcoming election. The trial judge's conduct raised the appearance of impropriety. The special judge found that this conduct called into question the trial judge's impartiality and that the appearance of impropriety supported the conclusion that the trial judge's personal or political reasons may have prejudiced the Defendant at her sentencing hearing. We conclude that the trial judge's conduct was prejudicial to the judicial process. T.R.A.P. 36(b).

In consideration of the foregoing and the record as a whole, we reverse the judgment of the trial court and remand the case for resentencing.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE