IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville July 26, 2016

## STATE OF TENNESSEE v. MICHAEL HALLIBURTON

**Appeal from the Criminal Court for Shelby County**
**No. 14-04181     J. Robert Carter, Jr., Judge**

_____

**No. W2015-02157-CCA-R3-CD – Filed December 6, 2016**

_____

A Shelby County jury convicted the defendant, Michael Halliburton, as charged of one count of attempted first degree premeditated murder, two counts of aggravated assault, and one count of domestic assault. After imposing a sentence, the trial court granted the defendant's motion for a new trial and entered an order recusing itself from presiding over the new trial. Thereafter, the State filed an application for an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, which this court granted. On remand, the defendant was given a new sentencing hearing and a hearing on his motion for new trial. The successor trial court, serving as thirteenth juror, approved the jury's verdict and merged the defendant's convictions for aggravated assault and domestic assault with his attempted first degree murder conviction before imposing a sentence of twenty-one years. The successor court then denied the defendant's motion for new trial. On appeal, the defendant argues: (1) the evidence is insufficient to sustain his convictions because he was insane at the time he committed the offenses or, alternatively, was incapable of forming the requisite culpable mental states for the offenses; (2) the trial court abused its discretion in admitting several items of evidence; (3) the trial court abused its discretion in granting the State's motion in limine and excluding the testimony of two defense witnesses; and (4) the trial court erred in denying his motion for a mistrial on the basis that the rule of sequestration was violated. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Blake D. Ballin and Richard S. Townley, Memphis, Tennessee (on appeal) and Blake D. Ballin (at trial) for the Defendant-Appellant, Michael Halliburton.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; Karen Cook and Samuel D. Winnig, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns the defendant's brutal beating of his wife with a metal knife sharpener. At trial, the defendant asserted that he was insane at the time of the attack or, alternatively, was incapable of forming the requisite culpable mental states for the offenses.

**Trial.** Virginia Halliburton, the victim, testified that on September 6, 2012, her husband, the defendant, tried to beat her to death with a knife sharpener after she told him she was filing for divorce. The night before this attack, the victim had slept in her son's room, which was empty because her son was away at college. The defendant entered this room and raised his fist as if to hit her. When the victim screamed, the defendant said, "[M]aybe if I just hit you you'll call the police and it will all be over." The defendant then asked the victim if she had cheated on him, and she said, "[N]o, I do not do that. I would never do that to anybody."

The following morning, the victim met with her attorney about obtaining a divorce. When the victim picked up her daughter, E.H.,[1] from school, she informed her about the divorce. The victim later took E.H. to voice class. When they arrived at home, the victim told the defendant she was filing for divorce. The victim said the defendant was "not happy" about the news and blamed her for her own unhappiness. Despite this, the victim said she "never argued" with the defendant at the time of the attack because she was "not an arguing woman."

Later that day, the victim took E.H. to dance class and while she was out, she called her attorney to say that she "was a little afraid" to go home. She then corrected, stating that she was "more than a little" afraid of going home. When the victim and E.H. returned home at 7:45 p.m., they got some food in the kitchen before sitting down in the den. The defendant, who was walking around the kitchen, was "somewhat agitated" but not "out of control." When E.H. went upstairs, the defendant stood over the victim, and in a "very calm, rational[] voice," said, "[W]hen I start to hit you, you're not going to get up, and I'm going to kill you." The defendant took three steps into the kitchen and pulled out a knife sharpener from a canister on the counter. The victim realized the defendant was going to hit her, and she got on the floor with her arms over her head. When the

---

[1] Although E.H. was eighteen years old and in twelfth grade at the time of trial, she was fifteen years old when the offenses in this case were committed.

defendant hit her with the knife sharpener, the victim said, "[Y]ou need to stop [be]cause you're going to kill me," and the defendant replied, "[Y]es, I am."

E.H., who heard her mother's screams, came downstairs and tried to protect her. With E.H.'s help, the victim crawled into the kitchen where she tried to stand but fell because she was bleeding profusely. The defendant pushed E.H. away and continued to beat the victim on the head with the knife sharpener. The victim "knew [she] had to get out of the house [be]cause . . . he would kill [her]" and was worried about what the defendant would do to their daughter. E.H. was able to open the back door, and she helped the victim stand. As the victim pressed the button to open the garage door, the defendant threw her down the steps into the garage. The victim crawled toward the mouth of the garage, and the defendant kicked and beat her, choked her at one point, and continued to hit her with the knife sharpener.

E.H. was eventually able to get the knife sharpener away from the defendant, although the defendant continued to kick and beat the victim. E.H. hit the victim's van with the knife sharpener to attract attention and screamed for help. Eventually, neighbors Charles Penland and Lynn Brotchner, who had heard the victim's and E.H.'s screams, came to their rescue. The victim said that when Penland asked the defendant what was wrong with him, the defendant said, "[S]he's my wife. I can beat her if I want."

As a result of this incident, the victim sustained several serious cuts to her head, which required one to two hours to close with stitches. In addition, the top of the victim's left ring finger was severed, her lip was badly split, and her right pinky finger was badly broken. The victim said that the pain from her head trauma "never goes away." She underwent two surgeries on her severed left finger and the joint of her right pinky finger. Because of the severity of the victim's injuries, her physicians did not release her to return to work for six months.

The victim stated that the defendant "ha[d] always been angry" but that she was "very good at calming him down because [she] never argued with him." She said that while the defendant was "out of control" at some points during the attack, "it was pretty clear he knew exactly what he was doing" and "meant to kill [her]." The victim admitted she never told the police that the defendant said, "She's my wife, I can beat her if I want to," but insisted that the defendant made this statement during the incident.

The victim asserted that she and the defendant shared a bed until two weeks prior to the attack. While she acknowledged incurring a $50,000 credit card debt, she said she paid off this debt with her inheritance. The victim denied playing psychological games with the defendant, such as calling him names in front of his family. Although she admitted telling Detective Clark after the attack that she was going to file a civil suit and

believed she could get everything, she claimed she was only repeating what her attorney had told her.

David Compton, who lived next door to the Halliburtons, testified that around 8:00 p.m. on September 6, 2012, he and his wife heard someone screaming. Although Mr. Compton initially believed the noise was coming from a television show, he soon discovered that the screaming was coming from outside. His wife, Peggie Compton, went outside, and he followed her after grabbing his cell phone. Mr. Compton called 9-1-1, and as he approached the Halliburtons' home, he saw the victim kneeling on the floor of the garage and the defendant entering his home. He later realized the victim was "totally covered in blood."

Peggie Compton testified that when she ran outside, she saw the defendant in his garage striking the victim four or five times with a long object. The victim had her hands on her head and was in a fetal position on the floor of the garage, and "[t]here was blood everywhere." Mrs. Compton heard E.H. yelling, "[N]o, dad, stop, stop," and saw E.H. clawing at the defendant's face in an attempt to protect her mother. When Charles Penland, another neighbor, yelled for the defendant to stop, Mrs. Compton heard the defendant say, "[T]his is my wife. I'll beat her if I want to."

Charles Penland, another neighbor, testified that he saw E.H. wrestling with the defendant in an attempt to protect her mother. E.H. jumped on the defendant, the defendant pushed her off, and then E.H. ran at him again and put her hands in his face. At the time, the defendant was beating the victim on the head with a heavy knife sharpener that measured approximately eighteen inches long. Although the defendant had this weapon in one of his hands, he was using his other hand to push his daughter away. Penland tried to get E.H. away from her father and then saw the victim sitting with her head down at the opening to the garage. E.H. screamed that the defendant was going to kill her and her mother. At one point, he heard E.H. yell, "Are you insane?," and heard the defendant reply, in a "contrived" way, "[Y]es, I am insane." Penland then heard the defendant say, "[S]he's ruined my life."

Penland screamed at the defendant to drop the weapon, and the defendant eventually complied. E.H. grabbed the weapon and ran toward Penland, who took it from her. Lynn Brotchner, another neighbor on the scene, helped the victim stand, and Penland told the defendant not to move. The defendant "paced a couple of times" before heading to the garage. Penland said that although there was shovel and an axe in the garage, the defendant never tried to attack him. When the police arrived, Penland and some other individuals helped the victim, who was covered in blood, walk to the ambulance.

Lynn Brotchner said she saw the defendant beating the victim with a long metal object and saw E.H. coming between the defendant and the victim. Brotchner told the defendant to stop beating his wife, and he eventually stopped after he struck her a few more times. As Brotchner was on her cell phone with 9-1-1, she heard the defendant say, "That's my wife. I can beat her all I want."

Lieutenant Kevin Simpson testified that when he arrived at the scene, he saw that the victim had a partially severed finger and that her face and hands were covered in blood. Although the defendant initially refused to leave the home, he eventually left and was arrested after talking to a police negotiator. When Officer Simpson went to the jail a few hours later to inform the defendant of his bond, the defendant said, "[S]he f[-----] everything up and I put the icing on the cake."

E.H., the daughter of the defendant and the victim, testified that when her father took her to school the morning of the attack, he informed her that he and her mother "were going to get a divorce." At the time, her father "seemed indifferent" and "[j]ust a little upset." Later that day, her mother picked her up from school and took her to voice class. On the way home, her mother told her about the divorce. Before leaving for dance class, she heard her mother and father arguing about the impending divorce, although her father was doing most of the yelling.

When E.H. arrived home after dance class, she sat in the den while her parents argued. Her father was yelling the loudest, and her mother was "just kind of sitting there silently." After going up the stairs, E.H. overheard her father complaining about her mother's family and saying things about why their relationship was so terrible. She specifically remembered her father talking about how her mother's deceased father was an alcoholic and heard him complaining about credit card debt.

E.H. went upstairs, and a few minutes later, heard her mother screaming for help. When E.H. came downstairs, she saw her father in the den beating her mother with the knife sharpener. As her mother tried to crawl away, her father hit her repeatedly, and her mother's blood was "[e]verywhere." E.H. tried to stop her father by screaming at him, trying to get the knife sharpener away from him, and clawing at his eyes, but he continued to beat her mother. Despite these efforts, her father never struck her with the knife sharpener or hurt her, although he continued to beat the victim. When asked if her father even knew she was present during the attack, E.H. replied, "[It s]eemed like I was just something in the way of stopping him from getting to my mom." As the victim tried to crawl away, the attack moved to the kitchen and the back door of the house. When E.H. finally got the knife sharpener away from her father, he began kicking her mother in the head before getting the weapon back. When the defendant pushed the victim down the steps at the back door, the defendant, the victim, and E.H. ended up in the garage.

Although the garage door was initially closed, someone pushed the button to open the garage door. Once in the garage, the defendant struggled to get to the victim, and E.H. tried to stop him by screaming for help. Her mother crawled to the opening of the garage, and when E.H. took the knife sharpener to hit her father's car to alert the neighbors, her father started kicking and hitting her mother, and she returned to her mother's side. Eventually some neighbors, including Charles Penland, arrived to help them. The neighbors walked her mother down the driveway, and E.H. stayed near her father to ensure that he would not go after her mother again. While she and her father were standing at the open garage door, E.H. asked her father if he was crazy, and he "said that he was crazy." Following this attack, E.H. and her mother were covered in blood, although her father had less blood on him. E.H. said she had never seen her father put his hands on her mother prior to that night.

Sciara Childress testified that she was the 9-1-1 dispatcher who answered the defendant's call after police officers surrounded his home. When the defendant said he wanted to surrender, Childress connected the defendant to a police negotiator, Captain Marc Molina, who was just outside the defendant's house. The recorded conversation between the defendant, Childress, and Captain Molina was played for the jury. During a portion of the lengthy 9-1-1 call, the defendant made the following statements:

> Well my wife ran up huge credit card debts and then we paid them off and then she tells me she wants a divorce and that we don't make enough money to—for her. That she will never care about me and I will never, she will never make me happy and I will never make her happy. And I begged and pleaded with her to please let's go to marriage counseling and she just basically said, "Screw you" and I just lost it.
>
> . . . .
>
> . . . I mean I f[-----] up here, I mean I lost it, I just, I just lost it, I was just standing there and then I was mad and I was yelling and then she just looked at me like I was a piece of shit and I just lost it.
>
> . . . .
>
> I messed it up so bad I didn't care what happened to me afterwards, I don't care, now I'm like looking at okay it's really real now, I f[-----] up, I'm there.
>
> . . . .

Well I keep having anger problems. I've never raised a hand at her. She likes to beat me down to nothing and when I—I'm getting mad, I'm getting angry, now she's telling me that our house is too small, our, you know, you know, [I'm] messed up because of my dad and my mother—denigrates my family all of the time. Here she's got her family, they're all millionaires but they're all like—her dad exposing himself to girls in the neighborhood—and you know her sister like had multiple affairs, screws people and gets their money and then the brother like sleeps with men on the internet, I mean it's just bizarre, you know, and I'm talked about like I'm a piece of trash.

. . . .

. . . [T]here's two resolutions, either I kill myself or I walk outside and I go to jail.

. . . .

I just snapped, I just lost it, I totally lost it, I couldn't, I just can't believe that this person did this to me after all the time I put into this relationship, [she] throws it all up in [my] face.

. . . .

Yeah, I mean they just burn people down and they walk from it. They don't even bat an eye. Her brother like stole $400,000 from her dad and they all like just walk away. Nobody batted an eye, unbelievable. Her sister did the same thing to some other guy and then there's her other two brothers and they just walk away. And after 22 years she's just like, "Okay, well, all right, I'm walking away." Nice to know ya.

Captain Marc Molina testified that he convinced the defendant to exit the front door of his home after they had a lengthy conversation. He said the defendant was "relatively calm and quiet" as he was placed in the back of the police car. Although the defendant talked about committing suicide during the negotiation process, Captain Molina believed that the defendant was "rationalizing what his options were at the time" and did not appear to be "suicidal or homicidal" as he was being placed in the back of a police car. He added that although the defendant was in a state of distress and panic during the 9-1-1 call, he was calm by the time he was taken into custody. Captain Molina said the defendant asked about his wife's condition during their phone call.

Officer Ginny Tibbels, the officer who transported the defendant to jail, testified that the defendant appeared calm, though "[a] little disheveled," when he was brought to her patrol car. During the ride to the jail, the defendant told her that his handcuffs were so loose that they were slipping off his hands. Officer Tibbels said the defendant was not so bloody that she had to clean the back of her patrol car after transporting him to the jail.

Detective Kim Clark, who photographed the crime scene and took the victim's statement, testified that her photographs depicted a trail of blood from the den into the kitchen and the garage. Upon arriving at the hospital, Detective Clark saw that the victim had a lip that was split up to her nose, had numerous lacerations to the top of her head, and had blood running down her face. She also saw that the tip of the victim's left ring finger had been severed and was bandaged and that her pinky finger on her right hand had been broken. Detective Clark took additional photographs of the victim's injuries when she came to the police department to give a statement five days after the incident. The injuries to the victim's head were more visible at that point because her head had been shaved to stitch up her lacerations and her black eye and the bruises on her body were more visible. Several photographs of the crime scene and the victim's injuries were published to the jury. Detective Clark said she had collected E.H.'s bloody clothes from the attack, and these were also published to the jury.

Taylor Halliburton, the defendant's and victim's son who was away at college at the time of the incident, testified that his parents "did on occasion have disagreements." On the day of the incident, Taylor[2] said his father called him at 5:30 p.m. to let him know that he and the victim were getting a divorce. During this conversation, his father sounded "very calm, collected[.]" Around 8:00 p.m., the defendant told Taylor "that he had just tried to murder [his] mother, and that he was expecting the police swat team to come in and get him from the house any minute." He said his father sounded calm, just as he did during the first call, but also a little "agitated." Taylor was surprised to learn about the attack because it was out of character for his father. He said he had never seen his father become violent with anyone when angered.

The defendant called three individuals, Maureen Bagwell, Katyusha Pehlivanlva, and Susan Ferkin, as character witnesses. All three women were teachers at the high school where the defendant taught, and they testified as to the defendant's character and reputation for truthfulness. Bagwell stated that she "never doubted anything that [the defendant] told [her]." She said that the defendant was a "[v]ery peaceful person" and "[a] very gentle person" and that it would surprise her if the defendant had a mental disorder. Pehlivanlva testified that she once saw the defendant with his daughter at an

---

[2] To distinguish the various members of the Halliburton family, we will occasionally refer to individuals by their first names, and we mean no disrespect.

opera concert and that he appeared to be a "calm and tender" father. She said the defendant told her it was "[v]ery tough" to leave his son at college. Pehlivanlva said she believed that the defendant was a truthful and peaceful person and that he had never acted like he was mentally ill. Ferkin testified that the defendant never looked like he was suffering from a mental disorder. She said the defendant was "[v]ery truthful" and an "extremely calm, caring[] person" who was "[v]ery peaceful." Ferkin said it would surprise her if someone said the defendant intentionally tried to kill someone.

The defendant testified that he received numerous scholarships in college and graduate school and ultimately earned a Ph.D in history. He met the victim in college, and they got married in 1990. Almost immediately after their marriage, the victim began to withdraw from sex. The victim began acting erratically, at times expressing satisfaction with the defendant and then expressing extreme dissatisfaction and threatening divorce. Within the first month of their marriage, the victim took the checkbook away from him and required him to consult her before making any major purchases. By the middle of their marriage, the defendant slept on the couch downstairs or on the floor.

The defendant said that he was extremely involved in his children's lives but that he and the victim often disagreed about the appropriate punishment for their children. The victim frequently undermined his decisions regarding discipline in front of the children, and on one occasion, became enraged over the issue. The defendant, who admitted that he had "some anger issues" from his own childhood, said they both went to therapy for a short time. The victim threatened to divorce him several times during the marriage, and they began sleeping in different rooms. He denied ever hitting his wife prior to this incident.

The defendant said the victim often returned home extremely angry after visiting her family. He stated that the victim's family had "reality distortion" and that although the victim's father tried to pretend he was a good citizen, he was dishonest, and the victim told him her father had molested two girls in the neighborhood. The defendant said he was generally mistreated by the victim's family and was, on one occasion, pushed out of a family photograph. In light of what he knew about the victim's family, the defendant was uncomfortable having his children stay with them unless he or the victim was present.

When the defendant discovered that the victim had incurred a $55,000 credit card debt nine months before the attack, the victim became sexually aggressive and said he could "have any kind of sex with [her]" he wanted. After this incident, he came up behind her and grabbed her affectionately, and the victim screamed, "[W]hat do you

think I am, a prostitute." At various times throughout their marriage, the victim told him he would never make enough money to make her happy.

The week prior to the attack, the victim asked the defendant if he had ever had sex with more than one person in a single day, and when he replied that he had not, the victim told him that she had and laughed. She then told him that she used to have sex with her boss in his office. Frequently, the victim told the defendant that he was "messed up because of [his] dad" and that he was "schizophrenic" and "[b]ipolar." He said the victim's statements about his mental health intensified in the nine months between discovering the credit card debt and the attack.

Despite their marital problems, the victim told the defendant two days prior to the attack that she would never leave the marriage. However, a few days before, when she had told him she had sex with two men in the same day, the victim informed him that she wanted a divorce. The defendant said that despite the victim's mistreatment, he sometimes wanted to kill himself but never wanted to kill her. The night before the attack, he walked into his son's room where the victim was sleeping. The victim told him she was thinking about getting a divorce, and the defendant lunged at her but did not raise his fist or touch her. The following day, he drove his daughter, E.H., to school and told her that her mother was thinking about getting a divorce. At the time, he was not worried because the victim had threatened divorce several times in the past and had never followed through. When E.H. returned from dance class that day, the defendant realized that the victim, who was "emotionless," seemed serious about obtaining a divorce. The defendant later heard the victim telling their daughter that he did not like her family, and he explained to his daughter that the reason he did not like to visit the victim's family was because the victim's father was a pedophile. Their daughter left them as they argued, and the victim told him she was moving to an apartment. When the defendant realized that the victim would be taking their daughter with her, he told her, "[W]ell, just get your fat ass into an apartment[.]" Then the defendant walked over to the victim's chair and told her that she was as evil as her siblings.

As the defendant was about to leave, he saw a bright light emanating from the lamp near where the victim was sitting. He said the lamp appeared "100 times brighter than it was" and looked like "a giant sparkler going off and just cascading down through my head." The next thing he remembered was standing over the victim with a knife sharpener. At the time, the victim looked like she did not have a face. He hit her one time with the knife sharpener, and then he heard a voice that said, "[Y]ou might as well hit her again." He then struck the victim repeatedly with the sharpener and heard the victim say his name before "the sounds [went] off" and he stopped hearing anything. The victim crawled to the kitchen, and he continued to hit her. At that point, E.H. came downstairs and jumped on him. E.H. began scratching him in the face and hitting him as

hard as she could. He said that although he saw E.H.'s mouth screaming at him, he could not hear anything. He continued to hit the victim, and E.H. eventually got the knife sharpener away from him. He followed the victim as she exited the kitchen, grabbed her with both hands, and threw her onto the concrete floor of the garage.

Although the defendant recognized E.H. as his daughter, he said the victim appeared to be a "monster" resembling a pig with claws. The defendant made several drawings depicting the attack, which were admitted into evidence. The defendant kicked the victim twice in the garage and saw E.H. throwing the knife sharpener in the garbage. He then saw a man and a child, who was three or four years old, at the opening of the garage. The victim pulled herself up by grabbing onto an easel in the garage and said, "I can't see." E.H. gave the knife sharpener to this man, whom the defendant eventually recognized as Charles Penland. Then E.H. ran up to the defendant, hit him hard on the chest, and yelled, "[A]re you insane?," and he replied, "I'm insane." He did not recall telling anyone that this was his wife, and he would beat her if he wanted.

When asked if he was in control during the incident, the defendant stated, "No more than I would be if I were inside a movie." As for whether he knew he was beating the victim, the defendant explained, "I was beating a monster to get a monster out of my house because the monster was a threat to my child."

The defendant went back inside the house and noticed that there was blood covering the floor of the kitchen. He changed out of his bloody clothes and washed himself. The defendant felt like he had just awoken from a deep sleep, and when he realized "that this terrible thing had happened," he was in "shock." He said the attack lasted three to five minutes. A short time later, the defendant stopped hallucinating, began hearing sounds again, and realized that he had to "fix things" and do what he was "supposed to do." He knew he was going to jail and called his aunt, son, and brother to tell them what he had done. He also arranged for a substitute teacher, proofread a report that was due the next day, and called 9-1-1.

After spending several days in jail, the defendant began having hallucinations again. He posted bond and checked himself into Lakeside Behavior Health System (Lakeside Hospital or Lakeside) for treatment. While there, his hallucinations dissipated, although he continued to have some violent fantasies. He received medication while at Lakeside but one of the medications was discontinued because of its side effects. He said he had faithfully attended therapy after he was released from Lakeside. The defendant asserted that he never intended to kill the victim on September 6, 2012, and did not know what he was doing during the attack.

The defendant admitted that the stressors that triggered his attack on the victim were the result of problems with his family and the victim's family. His father had called him "scum of the earth," and the defendant had not attended his father's funeral. The defendant admitted that the victim's father was dead when he told his daughter that the reason he did not like visiting the victim's family was because the victim's father was a pedophile. He acknowledged that his account of the attack was consistent with the victim's account.

The defendant said he took off his bloody clothes and washed himself before calling 9-1-1 because he was not thinking clearly. He said he made several telephone calls to family members, arranged for a substitute teacher, and completed a work report to "fix" the situation as best he could, although he could not explain why he did these things prior to calling 9-1-1. He conceded that he could have merely exited his home rather than calling 9-1-1.

The defendant admitted that he never said anything to Captain Molina about his hallucinations of the victim. He also admitted that he never showed the drawings depicting his hallucinations to his psychiatrist at Lakeside Hospital. While he did show these drawings to his psychotherapist, Trina Middleton, and to Dr. Ciocca, he acknowledged that he never provided the drawings to the State's expert, Dr. Zager, when she interviewed him. The defendant admitted that Trina Middleton never diagnosed him with psychosis despite the fact that he showed her his drawings but asserted that he was not psychotic at the time he saw Middleton.

Dr. John Ciocca, who was accepted as an expert in the field of psychology for the defense, testified that he reviewed the defendant's medical records, psychological records, and the information disclosed during discovery and conducted interviews and testing of the defendant. After conducting his evaluation, Dr. Ciocca opined that the defendant "was suffering significantly from . . . a Brief Psychotic Disorder at or about the time of [the attack]." He explained that Brief Psychotic Disorder (BPD), which was an official and accepted diagnosis, "is an illness that has sudden onset in which a person loses contact with reality, distorts the images and events and people around them, becomes delusional, and behaves in a way that is uncharacteristic for them during the course of their normal life." He stated that BPD "may or may not be associated with another illness . . . and is often brought on by stressors."

He noted that the defendant had voluntarily admitted himself to Lakeside Hospital within twenty-four hours of being released on bond, which was five days after the incident. Lakeside's admission diagnosis for the defendant was "recurrent depression, psychotic." Dr. Ciocca said a person who is psychotic has "difficulty with their ability to perceive reality in the way that the average person does." While at Lakeside, the

-12-

defendant reported that he was suicidal at times and "was continuing to have violent visions even when his eyes were closed." The defendant also said he had "severe depression and [had] continual visions in his mind of engaging in violence." The psychiatrist at Lakeside indicated that the defendant had delusions, agitation, anxiety, and depression, which resulted in significant loss of functioning. Dr. Ciocca stated that this evaluation was significant because it showed that another clinician had recognized that the defendant was having symptoms of psychosis at or around the time of the admission, which coincided with the information the defendant had disclosed to him. On the date the defendant was admitted, a Lakeside evaluator described the defendant as "suicidal, harm to self, homicidal, harm to others, and . . . psychotic. Upon discharge, a psychiatrist at Lakeside diagnosed the defendant with Bipolar Disorder and prescribed him medication. However, at the time of discharge, the defendant had "stabilized somewhat and was no longer suffering from psychotic symptoms." Dr. Ciocca stated that the defendant had followed his discharge plan diligently, which included seeing a psychotherapist, Trina Middleton, as well as a psychiatrist.

Dr. Ciocca said he gave the defendant several psychological tests and interviewed him for approximately twenty hours. These tests, which had internal malingering controls, did not show that the defendant was exaggerating his symptoms. After conducting his evaluation, Dr. Ciocca identified several stressors that could have triggered the defendant's attack on the victim. He noted that the defendant and the victim had an "unsatisfactory" marriage. The victim and the defendant were teachers, and the defendant was concerned about the victim's spending habits and her dishonesty. Dr. Ciocca also noted that the victim demeaned the defendant and treated him with disrespect and that the victim and the defendant had not slept in the same bed for several years, with the defendant sleeping on a couch or the floor. Despite these issues, there had never been any aggression or violence between the victim and the defendant prior to the attack. Dr. Ciocca said after the victim informed the defendant that she was pursuing a divorce, the defendant began having "distorted images of her and of others," and saw the victim with "a distorted evil look." The defendant's description of these images was consistent with other clients who had "well documented psychotic episodes."

After completing his testing and examination of the defendant, Dr. Ciocca opined that at the time of the attack, the defendant's Brief Psychotic Disorder was part of his existing, but undiagnosed, bipolar disorder. He said the stressors that triggered the defendant's BPD included the financial issues related to the victim's spending habits, the victim's disrespect of the defendant, and the victim's rejection of the defendant sexually. Dr. Ciocca said the defendant's BPD caused "distortions of reality that included hallucinations" and "disorganized behavior that was very impulsive." He said the defendant's BPD episode lasted several days but less than a month and said that although the defendant was not hallucinating during the entire episode, he had disturbing images of

-13-

attacking his wife five to six days after the incident, which were residual symptoms of the BPD.

Dr. Ciocca stated that the defendant's admission to his daughter during the attack that he was crazy did not rule out that he was having a psychotic episode. He explained that some people who are going through a mental crisis "have some perspective on it[,]" and they are able to say "I . . . feel crazy." He also asserted that the defendant's 9-1-1 conversation, in which he said he had already arranged for a substitute teacher and was worried about the SWAT team shooting his dogs, did not rule out his diagnosis of Brief Psychotic Disorder because the conversation merely showed the defendant "had walled [the psychotic episode] off enough to deal with the practical realities of the next day." After conducting this evaluation, Dr. Ciocca opined that the defendant suffered from a severe mental disease or defect that made him unable to form the premeditated intent to kill the victim. Dr. Ciocca also opined that as a result of a severe mental disease or defect, the defendant was not aware of the nature of his conduct and could not understand the wrongfulness of his behavior at the time of the attack.

Dr. Ciocca admitted that he did not state anywhere in his report that the defendant was unable to form the requisite mental state for the offenses or to appreciate the nature or wrongfulness of his actions. He opined that the defendant had grossly disorganized behavior, which is one of the diagnostic criteria for BPD, because he "wasn't able to exert willful control over his behavior." However, he acknowledged that if the defendant was simultaneously pushing his daughter away and hitting his wife, then his behavior toward his daughter was "under perhaps his control." He said that the defendant's ability to go "back and forth between these two actions is not a normal behavior."

While Dr. Ciocca admitted that the defendant appeared to be communicating in an organized way when he talked to a negotiator, removed his bloody clothes, cleaned himself up, telephoned family members, and emailed his school following the attack, he said those acts were not inconsistent with his diagnosis because the defendant "was able to pull himself together" following the attack. He conceded that the defendant had "pretty clear awareness of the aftermath of his behavior."

Dr. Ciocca said that if the defendant denied being suicidal while being booked at the police station, this denial, when considered with the other times he said he was suicidal, illustrated the defendant's erratic behavior. Dr. Ciocca acknowledged that although the treating psychiatrist at Lakeside Hospital said the defendant had "wild thoughts," he never made a definitive comment about whether the defendant was suffering from psychosis. He also acknowledged that the defendant's discharge diagnosis was "Bipolar Disorder Mixed" with no indication of psychosis. Dr. Ciocca conceded that

the psychiatrist who treated the defendant for six months diagnosed the defendant with "Bipolar Disorder without psychosis."

Dr. Ciocca acknowledged that the defendant's psychotherapist, Trina Middleton, diagnosed the defendant with major depression single episode severe without psychosis. However, when Trina Middleton saw the defendant on October 1, 2012, she concluded that the defendant's "psychotic symptoms were no longer evident in his clinical picture[,]" which supported his own diagnosis of Brief Psychotic Episode at the time of the attack.

The State presented testimony from Dr. Lynne Zager to rebut the defense's expert testimony from Dr. Ciocca. Dr. Zager, who was accepted as an expert in the field of psychology, testified that she received a court order to conduct a forensic evaluation of the defendant and subsequently interviewed the defendant and the victim, reviewed available records and reports, including Dr. Ciocca's letters, and listened to the defendant's 9-1-1 call that occurred immediately after the incident. After conducting her evaluation, Dr. Zager opined that the defendant could appreciate the nature and wrongfulness of his actions when he attacked the victim. She said that she was not asked to determine whether the defendant could form the requisite mental states for the offenses but noted that she did not see any conclusion in Dr. Ciocca's report on that particular issue.

Dr. Zager stated that the medical records from Lakeside Hospital and from the defendant's subsequent doctors showed diagnoses for depression, bipolar disorder, and mood disorder rather than psychosis. While the Lakeside records noted that the defendant was having "wild thoughts," they also stated that defendant's thought process and thought content were normal. Dr. Zager opined that Dr. Ciocca's testing did not show any psychosis and instead showed a rather "benign profile" with some depression and feelings of worthlessness. She said that the defendant never provided her with his drawings of the attack and that Trina Middleton's file and Dr. Ciocca's report did not reference these drawings.

After listening to the 9-1-1 call, Dr. Zager concluded that the defendant "was oriented as to time, place[,] and person[,]" "was rational" in his statements to the police negotiator, and showed no signs of psychosis during this phone call. She acknowledged that someone with Brief Psychotic Disorder would have symptoms for at least a day and would not have symptoms for five to ten minutes and then return to normal. She remarked that although the defendant had been evaluated by several different mental health providers, the only person who diagnosed the defendant with Brief Psychotic Disorder was Dr. Ciocca.

Dr. Zager said that she filed her report with the court approximately one week prior to the original trial date even though she had not been given the records from Lakeside Hospital, Trina Middleton, and Dr. Ciocca. She acknowledged that all the evaluations measured the defendant's mental health at the time of the evaluation rather than the time of the attack. She also acknowledged that the fact that the defendant did not have psychotic features at certain time periods after the attack did not mean that he did not have psychotic features at the time of the attack. While Dr. Zager admitted that a person could go in and out of a psychotic state over a period of time, she said the 9-1-1 call allowed her to evaluate the defendant's mental state immediately after the attack.

Dr. Zager said that while the first page of the Lakeside Hospital admission form noted that the justification for hospitalization of the defendant was "[h]allucinations, delusions, agitation, anxiety, depression, resulting in significant loss of functioning" the second page of the form said the defendant reported no hallucinations. In addition, the discharge summary from Lakeside said the defendant was depressed but was not hallucinating. Dr. Zager said there was no mention of the defendant seeing the victim as a pig with claws in the records from Lakeside Hospital but acknowledged that the comprehensive psychosocial assessment evaluation indicated in the high risk information that the defendant was psychotic. Dr. Zager said the only person who could definitively state what was going on in the defendant's mind at the time of the attack would be the defendant.

I.  **Sufficiency of the Evidence.**  The defendant argues that the evidence is insufficient to support his convictions. He claims that in light of Dr. Ciocca's testimony and his own testimony, the jury erred in rejecting his affirmative defense of insanity. He also asserts that the State failed to overcome his "diminished capacity" defense because Dr. Ciocca's testimony on this issue was uncontroverted. We conclude that the record supports the jury's rejection of the affirmative defense of insanity and that the State presented substantial evidence showing the defendant was capable of forming the requisite culpable mental states for the conviction offenses.

First, the defendant argues that the evidence is insufficient to sustain his convictions because no reasonable finder of fact could have failed to find that he was insane at the time he committed the offenses.[3] Tennessee Code Annotated section 39-11-501, which governs the affirmative defense of insanity, provides:

---

[3] While the defendant presents this argument as a sufficiency of the evidence issue, "the appellate standard of review for sufficiency is similar but not identical to the reasonableness standard adopted by our supreme court for review of a jury's rejection of the insanity defense." State v. Robert E. Odle, No. M2014-00349-CCA-R3-CD, 2014 WL 6607013, at *4 n.2 (Tenn. Crim. App. Nov. 21, 2014) (citing State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002)).

-16-

(a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in section (a). Such ultimate issue is a matter for the trier of fact alone.

This court "should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002). Clear and convincing evidence is defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Id. at 551 (quoting State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)). This reasonableness standard of review, which does not fully insulate the jury's finding as to the issue of insanity, "enhances appellate review by virtue of its similarity to the familiar sufficiency standard which appellate courts are accustomed to applying." Id. This court, in applying this standard, "should consider all the evidence in the record in the light most favorable to the [S]tate in determining whether the jury appropriately rejected the insanity defense." Id. Where the evidence is contested, this court "should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." Id. at 556.

Although the State "is required to prove all essential elements of a crime beyond a reasonable doubt, sanity is not an element of a crime." Holder, 15 S.W.3d at 911 (citing Patterson v. New York, 432 U.S. 197, 204-16 (1977)). The defendant has the burden of establishing the affirmative defense of insanity, and the State may counter any defense proof on this issue by presenting expert or lay testimony or by vigorously cross-examining defense experts for the purpose of undermining their credibility. Flake, 88 S.W.3 at 554 (citation omitted). The Tennessee Supreme Court has "explicitly reject[ed] the notion that the State must rebut defense proof of insanity with substantial evidence." Id. Moreover, "[i]n determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony

-17-

of lay witnesses, and expert testimony." Id. at 556. If expert testimony is presented at trial, the jury must evaluate the credibility of the expert witnesses, determine the weight and value of this testimony, and resolve all factual disputes raised by the evidence. Id. at 554 (citing Edwards v. State, 540 S.W.2d 641, 647 (Tenn. 1976)). This court does not reweigh the evidence or reevaluate the credibility determinations made by the jury. Id. (citing Holder, 15 S.W.3d at 912). "Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." Id. (citing Edwards, 540 S.W.2d at 647). While a jury "may not arbitrarily ignore [expert] evidence," it is "not bound to accept the testimony of experts where the evidence is contested." Id. at 556.

The defendant contends that given his own testimony and the testimony from Dr. Ciocca, the jury erred in rejecting his affirmative defense of insanity. In this case, Dr. Ciocca and Dr. Zager disagreed on whether the defendant could appreciate the nature and wrongfulness of his conduct. Dr. Zager did not believe that the defendant was suffering from Brief Psychotic Disorder at the time of the attack, noting that although several different mental health providers evaluated the defendant, Dr. Ciocca was the only person who diagnosed the defendant with BPD. She also noted that the defendant showed no signs of psychosis during his 9-1-1 call. While Dr. Ciocca testified that the defendant was unable to realize the nature or wrongfulness of his acts and the defendant testified that he did not know what he was doing during the attack, Dr. Zager opined that the defendant could appreciate both the nature and wrongfulness of his actions when he attacked the victim, and Dr. Zager's opinion was corroborated by substantial other proof offered by the State. The victim testified that the defendant calmly told her he was going to kill her before beating her and "knew exactly what he was doing" during the attack. In addition, the victim, the Halliburtons' daughter, and Charles Penland all testified that although the defendant beat the victim, he never injured his daughter, which indicates that the defendant appreciated both the nature and wrongfulness of his actions toward the victim. Moreover, the jury was able to evaluate the defendant's 9-1-1 call in determining whether he was insane. While the defendant claims the jury erred in not finding him insane at the time of the attack, the jury simply chose to accredit the State's witnesses over the defense witnesses, and we will not disturb the jury's verdict. Dr. Zager's testimony, in conjunction with the other evidence of the defendant's behavior before, during, and after the crimes, was sufficient to rebut Dr. Ciocca's opinion. Therefore, viewing the evidence in the light most favorable to the State, we conclude that a reasonable jury could have failed to find that the defendant's insanity at the time of the offenses was established by clear and convincing evidence. See Flake, 88 S.W.3d at 554.

Second, the defendant argues that the evidence is insufficient to sustain his convictions because the State failed to overcome his "diminished capacity" defense. He

claims that in light of Dr. Ciocca's uncontroverted testimony on this issue, no rational jury could fail to find that he lacked the capacity to form the specific intent for attempted first degree premeditated murder.

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Dorantes, 331 S.W.3d at 379.

As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3); see State v. Dickson, 413 S.W.3d 735, 745 (Tenn. 2013). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b).

First degree murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of

reflection and judgment." Id. § 39-13-202(d). This Code section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

The defendant asserts that because of a mental disease or defect, he was unable to form the requisite culpable mental states for the offenses, particularly the attempted first degree premeditated murder offense. Generally, expert testimony regarding a defendant's capacity to form the requisite mental state for a particular offense is admissible. State v. Ferrell, 277 S.W.3d 372, 379 (Tenn. 2009) (citing State v. Hall, 958 S.W.2d 679, 689-90 (Tenn. 1997)); State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994); see T.C.A. § 39-11-201(a)(2) (stating that no person may be convicted of an offense unless the culpable mental state required is proven beyond a reasonable doubt). In Hall, the Tennessee Supreme Court stated:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. United States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990). Thus, a defendant claiming diminished

-20-

capacity contemplates full responsibility, but only for the crime actually committed. State v. Padilla, 347 P.2d 312 (N.M. 1959). In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688. Such evidence "should not be proffered as proof of 'diminished capacity.'" Id. at 690. Rather, this evidence "should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." Id. (footnote omitted). In order for expert testimony regarding a defendant's mental state to be admissible, the expert must testify: (1) the defendant had a mental disease or defect, and (2) the defendant's inability to form the requisite culpable mental state was because of the defendant's mental disease or defect, rather than the defendant's emotional state or mental condition. See id. at 689-90; see also Ferrell, 277 S.W.3d at 379; State v. Faulkner, 154 S.W.3d 48, 56-57 (Tenn. 2005).

In Ferrell, the Tennessee Supreme Court held that "[n]othing in Hall limited its application to psychiatric testimony or specifically precluded other forms of expert testimony regarding a defendant's capacity to form a requisite mental state." 277 S.W.3d at 379. It clarified that the "decision in Hall established that the [mental health] testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense[.]" Id. The court added that the holding in Hall "was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" Id. (quoting Hall, 958 S.W.2d at 691).

The defendant intimates that the jury was required to accredit Dr. Cioca's uncontroverted testimony that the defendant was incapable of forming the requisite mens rea for the charged offenses. However, it was the jury's prerogative to assess the credibility of witnesses, to weigh the evidence, and to reconcile all conflicts in the proof. See Campbell, 245 S.W.3d at 335. The State presented substantial proof showing the defendant was capable of forming the culpable mental states required for the charged offenses. The defendant and victim had been arguing about their divorce the day of the attack. Just before the attack, the defendant, in a "very calm, rational voice" told the unarmed victim, "[W]hen I start to hit you, you're not going to get up, and I'm going to kill you." Neighbors Peggie Compton, Charles Penland, and Lynn Brotchner testified that they heard the defendant state that the victim had "ruined his life" and that "this is my wife, I'll beat her if I want to." The Halliburton's daughter and Penland testified that during the daughter's efforts to stop her father from beating her mother, he never attacked or injured the daughter and merely pushed her away so that he could continue beating the

-21-

victim with the knife sharpener. As a result of this brutal attack, the victim received multiple wounds to her head and body. After the victim's rescue but before he called 9-1-1 to surrender to the police, the defendant went inside his home, changed out of his bloody clothes, and called several family members to inform them that he had just tried to kill his wife. The protracted 9-1-1 call further supports the jury's finding of premeditation because it showed the defendant's calmness immediately after the attack. Accordingly, we conclude that the evidence is sufficient to sustain the defendant's conviction for attempted first degree premeditated murder as well as his other convictions.

**II. Admission of Evidence.** The defendant also contends that the trial court abused its discretion when it admitted several items of unfairly prejudicial evidence and that the erroneous admission of this evidence was not harmless. He claims the admission of this evidence "prejudiced [his] rights by inflaming the emotions of the jury [and] inciting contempt toward [him, which led] to a desire for retribution." Because the probative value of the challenged evidence was not substantially outweighed by the danger of unfair prejudice, he is not entitled to relief.

First, the defendant contends that the trial court abused its discretion in admitting the twenty crime scene photographs showing a trail of blood from the den to the garage, the eleven photographs depicting the injuries to the victim's body, and the daughter's bloody clothes. The defendant argues that a "testimonial description of the scene and . . . the victim's injuries" would have been sufficient given that "the underlying facts of the assault and extent of the victim's injuries were never in serious dispute" and that the trial was focused on his claims of insanity and diminished capacity.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

To be admissible, all evidence, including photographs, must be relevant to an issue the jury must decide. State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005) (citations omitted); State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Tenn. R. Evid. 403, Advisory Comm. Notes).

Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id. (citation omitted). If photographs do not add anything to the testimonial descriptions, they may be excluded. Id. (citations omitted). In addition, if the defense offers to stipulate to the facts shown in a photograph or never disputes the testimony that the photograph illustrates, then admission of the photograph itself may not be justified. Id. (citations omitted). Nevertheless, "a relevant photograph is not rendered inadmissible merely because it is cumulative." State v. Morris, 24 S.W.3d 788, 811 (Tenn. 2000) (citations omitted); see State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993) (holding that despite the admission of a color videotape showing the victim's bodies, the color photographs of the deceased victims were not "unnecessarily cumulative"); State v. Brown, 836 S.W.2d 530, 551 (Tenn. 1992) (holding that the nine photographs of the victim's body were admissible, despite testimony graphically describing the victim's injuries, because the photographs established "the brutality of the attack and the extent of the force used against the victim"). Finally, if the State is required to establish the degree of a homicide, it may properly introduce photographs and other evidence bearing on that issue. Id. at 952; State v. McAfee, 784 S.W.2d 930, 933 (Tenn. Crim. App. 1989).

During a bench conference at trial, the defense made a "blanket objection" to the admission of these photographs, asserting that "they become cumulative after you see so many of them and . . . they're prejudicial." The defense added, "There's quite a bit of blood and then when you get to the pictures of the alleged victim, you've got some pretty gruesome ones of her injury that . . . she can certainly describe. And the actual pictures of the blood do nothing other than play to the sympathies of the jury." The State replied, "We're having to show premeditation . . . [and] I don't think the jury is going to get . . . a very clear picture if they can't see what he did to her." The trial court held that while it would not allow the State to admit multiple photographs covering the same subject matter, the pictures that were not cumulative would be admissible. The trial court then required the State to limit the photographs it sought to offer so that there would be no repetition and excluded several photographs that the State wished to admit.

Later, during Detective Kim Clark's testimony, defense counsel objected to the admission of the daughter's bloody clothing. He said he was making the same objection he had made to the photographs, that the bloody clothing was "inflammatory," that it

"played to the jury's sympath[ies]," and that it was "prejudicial" without "much probative value." The trial court, without preamble, overruled the objection. Detective Clark subsequently identified the daughter's bloody clothing, which consisted of a black leotard, a sports bra, tights, and a pair of shorts, and these items were displayed to the jury.

The State, in order to prove the elements of the charged offenses, was required to establish that the defendant attempted to kill the victim and that the defendant acted with premeditation, and the challenged photographs, which depicted the brutality of the attack and the nature and extent of the victim's injuries, were particularly probative of these issues. While the defendant claims that the underlying facts of the attack and extent of the victim's injuries were not in "serious dispute," he did not make this argument at trial and never offered to stipulate to the facts shown in these photographs. The record shows the trial court made every effort to eliminate the cumulative photographs, and there is no indication that the "primary purpose" of the photographs was "to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" See State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)). Because the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice, we conclude that the trial court did not err in admitting them.

As to the admission of the daughter's clothing, we acknowledge that in most cases the admission of bloody clothing would have minimal, if any, probative value and should be excluded. However, in this case, the daughter's bloody clothing helped the State establish that the defendant attempted to kill the victim by completing a substantial step in the commission of the offense and that the defendant acted with premeditation. The daughter's bloody clothing corroborated her testimony about the incident and suggested that had she not intervened, the defendant would have killed the victim. While we acknowledge that the probative value of the bloody clothing may have been diminished in light of the other evidence admitted and that the admission of this proof carried the risk of potentially inflaming the jury, we cannot conclude, given the contested issues in this case, that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. In any case, even if the admission of the bloody clothing was error, the defendant has failed to show "that the error 'more probably that not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)) (citing State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001); State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999)); see Collins, 986 S.W.2d at 21-22; Banks, 564 S.W.2d at 952-53. In light of the admissions of the defendant, the defense theory, the witnesses' testimony, and the photographs of the crime scene and the victim's injuries, we do not believe that the

-24-

admission of the daughter's bloody clothing affected the judgment in this case or prejudiced the judicial process.

Second, the defendant argues that the trial court erred in refusing to exclude Exhibit 6, the photograph of the victim's home, garage, and driveway that generally depicted the area in which the attack occurred because it did not fairly and accurately represent the scene. The record shows Exhibit 6 was admitted into evidence and published to the jury without objection during David Compton's testimony. When Exhibit 6 was published, the State commented that this photograph was taken some time after the attack. During David Compton's cross-examination, the defense used Exhibit 6 to have Mr. Compton admit that he did not have a direct line of sight into the garage the night of the attack. Later, during Peggie Compton's testimony, the State displayed Exhibit 6, and Mrs. Compton identified where she was standing the during the attack. When she was asked whether a car was blocking her view, Mrs. Compton replied that the car shown in the photograph, E.H.'s vehicle, was not parked in the driveway that night. She explained that two other cars were parked on the driveway the night of the incident and indicated the location of those vehicles.

During a bench conference, defense counsel asked that Exhibit 6 be excluded. While acknowledging that the jury had already seen this photograph, he claimed that the continued use of Exhibit 6 would be error because it did not "fairly and accurately represent the way things were [the night of the attack]" and would be "burned in the jury's mind." The trial court overruled the objection, noting that both parties had acknowledged that these photographs were not taken the day of the attack and that the defense would have an opportunity to explain any differences. When direct examination resumed, the State acknowledged to Mrs. Compton that Exhibit 6 did not exactly represent how things looked the day of the incident and asked her a few questions about the location of the defendant's car on September 6, 2012, before deciding to use Exhibit 8, a drawing of the area, rather than Exhibit 6 during her testimony. The record shows that the defendant made no other objections to this photograph at trial.

In considering this issue, we note that the fact that a photograph does not precisely depict some details does not make it inadmissible, though it may affect its weight. See Gasteiger v. Gillenwater, 417 S.W.2d 568, 572 (Tenn. Ct. App. 1966) (photographs of stairway taken after repairs); Little v. Nashville, Chattanooga and St. Louis Railway Co., 281 S.W.2d 284, 293 (Tenn. Ct. App. 1954) (photographs taken at different time of year); Gordon's Transports, Inc. v. Bailey, 294 S.W.2d 313, 382 (Tenn. Ct. App. 1956) (photographs taken at different time of day). Because the jury was informed that Exhibit 6 was taken after the incident and because the State chose to rely on a different exhibit following the defense's objection, we conclude that the trial court did not abuse its discretion in refusing to exclude Exhibit 6.

Finally, the defendant argues that the trial court abused its discretion in allowing the victim to testify that she informed her attorney she was nervous about going home the day of the attack. He claims that a victim's statement of fear of a defendant is not relevant to prove a defendant's guilt, even if this evidence is viewed as evidence of the victim's state of mind. See State v. Leming, 3 S.W.3d 7, 18 (Tenn. Crim. App. 1998) ("[T]he victim's statement expressing his fears about the defendant would not be relevant for the state's case to prove the defendant's guilt, even if viewed as evidence of the victim's state of mind."); State v. Smith, 868 S.W.2d 561, 573 (Tenn. 1993) (While evidence of the victim's statement that she feared the defendant was admissible to show the victim's state of mind, it "was not directly probative on the issue of whether the Defendant had murdered her and her sons."); State v. Paul Graham, No. M2003-00331-CCA-R3-CD, 2004 WL 741666, at *10 (Tenn. Crim. App. Apr. 7, 2004) ("A statement by a murder victim expressing fear of the defendant is not directly probative that the defendant committed murder.").

At trial, the victim testified that she called her divorce attorney to inform her that she had told the defendant about the divorce. The victim started to testify that she told her attorney she was a little nervous about returning home, and defense counsel objected on the ground that this testimony was irrelevant. The trial court overruled the objection, holding that the victim's state of mind prior to the attack was just as relevant as the defendant's state of mind because the victim might have reacted in a certain way if she was afraid of the victim. The victim later testified that she called her divorce attorney to tell her that she was "a little afraid of going home." She immediately corrected, stating that she was "more than a little" afraid of going home.

We note that this testimony, which qualified as a state of mind exception to the hearsay rule, made it less likely that the victim provoked the defendant. It also explained why the victim avoided the defendant upon arriving home and declined to respond to him when he tried to talk to her. See Tenn. R. Evid. 401; Tenn. R. Evid 803(3), Advisory Comm'n Comment ("The Commission contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception."). For these reasons, we conclude that the trial court did not abuse its discretion in admitting this testimony.

**III. Exclusion of Evidence.** The defendant asserts that his right to confrontation and right to present a defense were violated when the trial court granted the State's motion in limine to preclude cross-examination of the victim about allegations that the victim's father was a pedophile and an alcoholic. He also claims that his right to present a defense was violated when the trial court excluded the testimony of Renee Pembroke and Cheryl Cooley about issues within the victim's family and the defendant's

-26-

relationship with his in-laws.  The defendant claims this testimony "was directly relevant to [his] insanity defense as it tended to show facts and circumstances that acted to trigger the psychotic break [he] suffered from at the time of the incident; namely, that the shock of the impending divorce was compounded by the prospect of the [d]efendant's teenaged daughter being put in closer contact with [the victim's] family."  He adds that Dr. Ciocca's testimony explained "how the problems with the wife's extended family could provide a triggering mechanism for a psychotic break" and "demonstrated how the line of inquiry was probative on the issues presented in the insanity defense."  The defendant asserts that these errors were not harmless because it appears beyond a reasonable doubt that they contributed to the guilty verdicts.

At trial, the defense cross-examined E.H. about the cause of her parents' argument just prior to the attack:

> Q.     You said something about [the victim's] family.  Do you remember what about her family was the issue?
>
> A.     Just [my father] was talking about [my mother's] dad and how he was an alcoholic or something.
>
> Q.     Okay.  Did—was there an accusation he was a pedophile?.

The State objected, asserting that the issue of whether the victim's father was a pedophile was not relevant "to the marriage or to this proceeding."  Before the trial court ruled, defense counsel stated, "I'll move on."  Defense counsel later acknowledged during his questioning of E.H. that the victim's father was not alive at the time of the attack.  During a bench conference following E.H.'s testimony, the State said it planned to make a motion in limine to preclude the defense from asking these types of questions about the victim's extended family.  It explained, "[The defendant] wants to put all the skeletons in anybody's closet out on the table.  The only skeletons that we need, if at all, [are the defendant's] and [the victim's]."  Defense counsel replied that he would talk to the State and ask the court to rule if the State objected to any of his questions on these issues.

Prior to the victim's testimony, the State made a motion in limine to restrict the defense's cross-examination of the victim regarding allegations that her father was a pedophile because such questions were "irrelevant to anything that's going on in this courtroom."  The defense asserted that this line of questioning was relevant to show the defendant's mental state:

> First, [the State] played an audio recording that included statements about [the victim's family].  They have made it relevant.  If it wasn't relevant,

they should have . . . asked Your Honor to redact the recording or they should have redacted the recording. They did not. But all throughout here there are statements about her, about her family, about her family mistreating people, about her []father exposing himself to young children. So for that reason, first and foremost, it's relevant.

The second reason it's relevant is that he is putting on an insanity defense. And that's already been talked about. It's obviously coming. We're going to have an expert testify about stressors [that could have triggered the defendant's Brief Psychotic Disorder]. And we're going to talk about just things that le[d] up to this incident. And these are part of . . . the context of their marriage which is the . . . central issue here that this argument was about . . . . And this attack flowed from these stressful things that [the defendant] had experienced for 20 plus years. Some of the stressful things were the way her family acted, the family dynamics, the way they treated him. All of those things are relevant.

Additionally, there's a point at which it hasn't been submitted to the jury yet and I'm not sure when it will come out. It may be when [the defendant] testifies and I expect him to . . . . [O]ne of the major stressors was that not only did he believe . . . that his wife was leaving him, but also that his 15[-]year[-]old daughter was going [with the victim]. And that she would now be taken into that family. So that's an additional stressor. That there's this family of pedophiles, of just horrible money grubbing people who[m] his daughter was now being taken to. So for those two reasons and also for . . . due process [reasons] he's trying to put on a defense as a defendant and we believe this is relevant and for reasons of due process we believe it should be allowed.

The trial court stated that the only way that it would allow this evidence was if the defense "could link it up as being one of the things that directly impacted the attack" and held that it was going to take the matter under advisement until it heard from Dr. Ciocca, the defense's expert, in a hearing outside the presence of the jury. The court said that if the relevance of this line of questioning was established through Dr. Ciocca's testimony, then the defendant could recall the victim and ask her questions about the allegations that her father was a pedophile.

Dr. Ciocca subsequently testified outside the presence of the jury that the defendant's long-standing concerns about the victim's family, including the allegations that the victim's father was a pedophile and her family's reaction to these allegations, could have triggered a psychotic episode within the context of an impending separation

-28-

and divorce. He said the defendant's concerns about the victim's extended family would help "the jury . . . understand the context of the stressful occurrences in this marriage that le[d] up to this [attack]." He added that "the various and sundry stressors that existed in this marriage and the transactions between husband and wife over time, the [victim's] deceit, the [defendant's] isolation that he experienced would be helpful in understanding the events on that day."

Immediately after Dr. Ciocca's testimony, the defense, outside the presence of the jury, proffered testimony from Renee Pembroke and Cheryl Cooley regarding the relationship between the defendant and the victim, the relationship between the defendant and his in-laws, and the issues within the victim's family.

Renee Pembroke, who was the ex-wife of one of the victim's brothers, testified that the members of the victim's family were nice to the defendant to his face but made fun of him behind his back. She said the defendant had talked to her about some of the things the victim's family had said about him. In addition, Pembroke described the victim as a "pathological liar" and manipulative. She said the victim sometimes acted "really sweet" toward the defendant and then was "very harsh shortly thereafter." Pembroke said she was aware of the allegations that the victim's father was a pedophile, and while she did not have any personal knowledge regarding these allegations, she had seen the victim's father pulling female family members, including herself, into his lap at family events when he was intoxicated. She believed the defendant was aware of the allegations that the victim's father was a pedophile, but because the victim's family was so secretive, these allegations would not have been common knowledge. Pembroke also revealed that four out of six of the victim's siblings were alcoholics and that the victim's father was an alcoholic. While she admitted that she was not a doctor qualified to diagnose someone with an addiction, Pembroke said, "[I]t's obvious when someone is an alcoholic."

Cheryl Cooley, the ex-wife of another of the victim's brothers, testified that the victim's family made the defendant feel like an outsider. She said they looked down on the defendant because he was a teacher and did not make very much money. Cooley was aware of allegations that the victim's father was a pedophile and believed the defendant was aware of these allegations. She noted that the victim's father would "always try to pull [her] and other women down in his lap[,]" which made her "feel very uncomfortable." Although she and the victim had once been friends, when Cooley asked for the victim's help with her husband's alcohol and gambling additions, the victim told her that she could not provide assistance because her mother and father would cut her out of their will. Cooley described the relationship between the victim and the defendant as "[h]ot and cold, on and off" because the victim always sided with her family. She said the victim, who was not a truthful person, had lied to her "consistently."

Following this testimony, the defense asked that it be allowed to present Pembroke's and Cooley's testimony to the jury in light of Dr. Ciocca's proffered testimony that these issues with the victim's family were stressors that could have triggered the defendant's Brief Psychotic Disorder. The court excluded Pembroke's and Cooley's testimony on the basis that it would "only confuse the jury." It noted that this testimony did not show the defendant "was personally aware, had personally observed any type of behavior by [the victim's father] with . . . young children[,]" which would indicate that the victim's father was a pedophile. Regarding whether the defendant was treated as an outsider by the victim's family, the trial court said that Pemroke and Cooley's testimony was merely "their interpretation of what they thought or what they perceived." However, the court said that if the defendant informed Dr. Ciocca that he was treated as an outsider by the victim's family, then this evidence might have "a little bit more credibility." Ultimately, the court held that it would allow the defense to present Dr. Ciocca's testimony to the jury "to further explain the actions of the defendant[,]" and that the jury would determine "the credibility and the expertise of the doctor just as they would any other witness in this case."

The defendant cites State v. Brown, 29 S.W.3d 427, 432-34 (Tenn. 2000), as support for his claim that his right to confrontation and his right to present a defense were violated in this case. Brown recognized that "'the rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.'" Id. at 432 (quoting Chambers v. Mississippi, 410 U.S. 284, 295-96 (1973)). It also outlined factors to consider in determining "whether the constitutional right to present a defense has been violated by the exclusion of evidence." Id. at 433. Pursuant to Brown, "the analysis should consider whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." Id. at 433-34 (citing Chambers, 410 U.S. at 298-301) (footnote omitted). The defendant claims the issues with the victim's family were "directly relevant" to his insanity defense because this evidence constituted stressors that triggered his psychotic break at the time of the crimes. He also claims that the testimony from Pembroke and Cooley was sufficiently reliable because they had personal knowledge about the allegations the victim's father was a pedophile and because Dr. Ciocca's testimony explained how these allegations could have triggered the defendant's psychotic break.

As to the motion in limine, the record shows that the victim's father died long before the offenses in this case were committed, and we conclude that any evidence regarding the allegations that the victim's father was a pedophile was appropriately limited by the trial court. After the court made its ruling, the defendant never recalled the victim or questioned Dr. Ciocca in the presence of the jury about the defendant's belief

that the victim's father was a pedophile.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").  Moreover, the defendant was able to testify that the victim's father had molested two girls in his neighborhood.  The record shows this evidence was not critical to the defense and was not sufficiently reliable, and the court's interest in excluding evidence irrelevant to the attack was substantially important.  See Brown, 29 S.W.3d at 434.  For these reasons, we conclude that the defendant's right of confrontation and right to present a defense were not violated by the trial court's ruling on the motion in limine.

We further conclude that the trial court did not err in refusing to allow Cooley and Pembroke to testify about the victim's family and how they treated the defendant.  This excluded testimony was not critical to the defense because the defendant was able to testify about these issues and how they affected him.  See id. at 434.  Although the trial court ruled that Dr. Ciocca would be allowed to testify as to how these issues with the victim's family constituted stressors that triggered the defendant's BPD, Dr. Ciocca never testified in the presence of the jury about the issues with the victim's family, choosing instead to focus on the victim's issues.  In addition, Cooley's and Pembroke's testimony did not bear sufficient indicia of reliability because it consisted of their perceptions of how the issues in the victim's family affected the defendant.  See id.  Finally, the trial court's interest in avoiding confusion to the jury, which supported the exclusion of this evidence, was substantially important.  See id.  For all these reasons, we conclude that the defendant's right to present a defense was not violated when the trial court excluded the testimony of Cooley and Pembroke.

**IV.  Denial of Motion for a Mistrial.**  Lastly, the defendant argues that the trial court erred in denying his motion for a mistrial.  He claims the court violated the rule of sequestration when it ordered a ten-minute recess while the sequestered jury sat in the jury box.  The defendant asserts that because the jury was "exposed to potential improper influence from whomever might have been in the courtroom at that time," a mistrial was an "absolute necessity."  Because the defendant has not shown that an actual separation of the jury occurred, he is not entitled to relief.

After the State rested following its rebuttal proof from Dr. Zager, the trial court stated that it was going to take a few minutes to review the jury instructions and wanted the last few exhibits, consisting of photographs, to be published to the jury during that time.  When the State asked if the court wanted all of the exhibits to go back to the jury, the court responded that it wanted the jury to review these exhibits "to pass the time" while she "pull[ed] the jury instruction[s.]"  The trial court then stated, "Court's in recess."  Before the exhibits were passed to the jury, the defendant's attorney asked to

-31-

speak to the court on the record because he was concerned that if the jury started reviewing the exhibits, it might "constitute the beginning of deliberations." The trial court responded, "The photographs were published. They were never passed to [the jury]." When the State also expressed concern about the jury "taking the pictures back before they [sic] start deliberating," the court explained that the jury was not "taking anything back" because Exhibits 37 through 46, which had been published, had not been passed to the jury. Following this explanation, the defendant's attorney said, "I think we all misunderstood." The record shows that the aforementioned exhibits were subsequently published to the jury, and the courtroom deputy announced that the court was in recess.

The trial judge exited the courtroom, and the jury presumably reviewed the exhibits at issue. After the trial judge returned to the courtroom but before the jury was brought in, defense counsel made the following motion for a mistrial:

> Judge, I have a motion to make before [the jury is brought into the courtroom]. I'd like to first make an offer of proof for the record that we were all a little confused. At 3:12 [p.m.] the proof closed and you took a recess. At that point the jury was left in the courtroom and had some pieces of evidence. They remained in the courtroom with the defendant, the State, myself, and all court personnel, but Your Honor was off the bench and we were off the record. That lasted until 3:22 [p.m.] when [the court officer] took them out of the courtroom. And so first I would just like the record to reflect the facts that I just recited. And then based on those facts I would ask for a mistrial. The reason being that the jury was exposed to potentially outside information.

When the trial court asked about the nature of this outside information, defense counsel replied, "Well, unfortunately there's no way for the Court to know what happened because we were off the record and Your Honor was not on the bench. But the jury sat in here for 10 minutes . . . ." The court said that the jury "was supposed to be looking at [those specified] exhibits" and "then after that, they left. I thought they left right after that." The court added that it never intended "for the Court to allow the jury to stay in here while [the attorneys] were talking." At that point, defense counsel asked for a mistrial because it was "unorthodox . . . and improper to leave the jury in the courtroom during a recess."

After the court reporter confirmed that the trial court took a recess, defense counsel stated:

-32-

[The record shows] that at 3:12 [p.m.] a recess was called. So when Your Honor left the bench we were off the record with the jury in the courtroom until 3:22 [p.m.] when the jury was finally escorted from the courtroom. And so we submit that that was improper and we would request a mistrial.

When the trial court asked if defense counsel was arguing that it was improper for the jury to remain in the courtroom during a recess, defense counsel replied:

Yes. That they were in here off the record. There was nobody to take down what was going on. They were exposed to anything . . . rather than being taken to the jury room where they are kept from outside influence. We have—the jury has been sequestered. We have taken great pains to make sure that there has been no outside influence on this jury. And they were left in the courtroom with all the court personnel.

Then the trial court said that "if someone here feels like that there was something said or there was some conduct or something like that that was done in those 10 minutes, then make that known on the record right now." The only person who responded was defense counsel, who stated, "I think we're ready to proceed. The Defense is."

Tennessee Code Annotated section 40-18-116 states that "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." The purpose of this sequestration rule is to "preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial[.]" State v. Bondurant, 4 S.W.3d 662, 671 (Tenn. 1999) (citing 23A C.J.S. Criminal Law § 1363(a) (1989)). Once a defendant shows that separation of a sequestered jury has occurred, the burden shifts to the State to show that the defendant was not prejudiced by the separation. Bondurant, 4 S.W.3d at 672 (citing Gonzalez v. State, 593 S.W.2d 288, 291 (Tenn. 1980)). However, the possibility of separation is insufficient to place the burden on the State to show that no prejudice occurred. State v. McClain, 667 S.W.2d 64, 66 (Tenn. 1984). "'It is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial.'" Gonzales, 593 S.W.2d at 291 (quoting Cartwright v. State, 80 Tenn. 620, 625 (1883)). If the State fails to satisfy its burden of showing that the separation did not result in prejudice to the defendant, then a new trial is required. Bondurant, 4 S.W.3d at 672 (citation omitted).

The Tennessee Supreme Court has explained the purpose of the rule of sequestration:

> [U]nder modern law, the test of keeping a jury "together" is not a literal one, requiring each juror to be at all times in the presence of all others. The practical needs of personal hygiene and separate rooms for sleeping, if nothing else, preclude such a literal application. The real test is whether a juror passes from the attendance and control of the court officer. State v. Bartlett, 137 Vt. 400, 407 A.2d 163, 166 (1979).

Bondurant, 4 S.W.3d at 671.

Here, the defendant asserts only the possibility of separation of the jury, which is insufficient to place the burden on the State to show lack of prejudice. The defendant conceded that the "court personnel" remained with the jury in the courtroom, and the record is devoid of any evidence that the jurors were not supervised by the court officers during this recess. Compare McClain, 667 S.W.2d at 65-66 (concluding that there was no improper separation of the jury when the evidence established that an appointed officer assumed the other officers' responsibilities to safeguard the jurors), and James Dellinger v. State, No. E2004-01068-CCA-R3-PC, 2006 WL 1679595, at *22-23 (Tenn. Crim. App. June 19, 2006) (holding that the petitioners were not entitled to post-conviction relief based on a separation of the jury when the evidence failed to show "the jurors were outside the presence of the court officers during the family gathering"), with Bondurant, 4 S.W.3d at 673 (holding that the court's officer's affidavit, which clearly and unequivocally stated that he had no control over the jurors when they drove their personal vehicles between their hotel and the courthouse, was sufficient to show an actual separation of the jury). Because the defendant has failed to show that an actual separation of the jury occurred, we conclude that the trial court properly denied the motion for a mistrial.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE